**10 CV 6234**

James N. Benedict
Douglas W. Henkin
C. Neil Gray
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000
*Attorneys for Defendants Neuberger Berman Management LLC,*
*Neuberger Berman, LLC, Benjamin Segal, Milu E. Komer, Peter E.*
*Sundman, and Jack L. Rivkin*

RECEIVED
AUG 19 2010
U.S.D.C. S.D.N.Y.
CASHIERS

Joanna A. Diakos
Sarah P. Kenney
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
(212) 536-3900
*Attorneys for Defendants John Cannon, Faith Colish, Martha C. Goss, C.*
*Anne Harvey, Robert A. Kavesh, Howard A. Mileaf, Edward I. O'Brien,*
*William E. Rulon, Cornelius T. Ryan, Tom D. Seip, Candace L. Straight,*
*and Peter P. Trapp and Nominal Defendant Neuberger Berman Equity*
*Funds d/b/a Neuberger Berman International Fund*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the Neuberger Berman International Fund,<br><br>Plaintiff,<br><br>- against -<br><br>NEUBERGER BERMAN MANAGEMENT LLC, *et al.*,<br><br>Defendants,<br><br>- and -<br><br>NEUBERGER BERMAN EQUITY FUNDS D/B/A NEUBERGER BERMAN INTERNATIONAL FUND,<br><br>Nominal Defendant. | 10 Civ. _____<br><br>**NOTICE OF REMOVAL**<br><br>Removed from:<br><br>Supreme Court of the State of New York County of New York<br><br>Index No. 650966/2010 |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that defendants Neuberger Berman Management LLC, Neuberger Berman, LLC, Benjamin Segal, Milu E. Komer, Peter E. Sundman, Jack L. Rivkin, John Cannon, Faith Colish, Martha C. Goss, C. Anne Harvey, Robert A. Kavesh, Howard A. Mileaf, Edward I. O'Brien, William E. Rulon, Cornelius T. Ryan, Tom D. Seip, Candace L. Straight, and Peter P. Trapp and nominal defendant Neuberger Berman International Fund (collectively, the "Removing Defendants"), by and through their undersigned attorneys, hereby remove the above-captioned civil action, and all claims and causes of action therein, from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §§ 1441 and 1446. The Removing Defendants appear for the purpose of removal only and for no other purpose, reserve all defenses and rights available to them, and state as follows:

Background and Related Actions

1.    Plaintiff filed the above-captioned action on July 15, 2010 in the Supreme Court of the State of New York, County of New York, under Index. No. 650966/2010 (the "State Court Action"). Pursuant to 28 U.S.C. § 1446(a) and Rule 81.1(b) of the Local Civil Rules of the United States District Court for the Southern District of New York, copies of the Summons and Complaint filed in the State Court Action are attached hereto as Exhibit A, a copy of the Affidavit of Service affirming personal service of the Summons and Complaint on the defendants is attached hereto as Exhibit B, and a copy of the stipulation extending the defendants' time to answer the Complaint through and including October 8, 2010 is attached hereto as Exhibit C.

2.    The purported "state law" claims in the Complaint were originally filed in

-2-

this Court in *Gamoran v. Neuberger Berman Management LLC et al.*, No. 08 Civ. 10807 (DLC) ("*Gamoran I*"); *Gamoran I* purported to plead both class and derivative claims, including the claims set forth in the Complaint plus claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68. The complaint in *Gamoran I* pleaded the existence of subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337.

3. *Gamoran I* was part of a group of cases filed in this Court alleging that investments by certain mutual funds in publicly-traded stock of certain non-U.S. companies were "illegal." All of those cases were deemed related and assigned to Judge Cote. This case was and is related to *McBrearty v. Vanguard Group, Inc.*, No. 08 Civ. 7650 (DLC) and *Seidl v. American Century Cos., Inc.*, No. 08 Civ. 8857 (DLC).

4. The primary substantive difference between the Complaint in this action and the complaint in *Gamoran I* is that the Complaint in this action omits the RICO claims that were asserted in *Gamoran I*.

Basis For Removal

5. This action is within the original jurisdiction of this Court under 28 U.S.C. §§ 1331 and 1337 because Plaintiff's claims raise a substantial issue of federal law. Plaintiff alleges, *inter alia*, that the Removing Defendants violated federal law by purchasing stock in publicly-traded overseas gambling companies that ultimately became the target of U.S. government anti-gambling enforcement actions in 2007.[1] Asserting that these investments were illegal, Plaintiff brings claims for breach of fiduciary duty, negligence, and waste.[2]

6. In *Grable & Sons Metal Prods., Inc. v. Darue Engineering & Mfg.*, 545

---

[1]     *See* Complaint ¶ 41.

[2]     *See id.* ¶¶ 128, 133, 139.

-3-

U.S. 308, 315 (2005), the Supreme Court held that claims removed from state court to federal court must "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." The Complaint meets the requirements of *Grable*.

7.     The Complaint necessarily raises issues of federal law. In *Broder v. Cablevision Systems Corp.*, 418 F.3d 187, 194 (2d Cir. 2005), the United States Court of Appeals for the Second Circuit held that a single "count" in a complaint may be treated as comprising separate state and federal claims. As explained below, here (as in *Broder*) the federal aspects of each of Plaintiff's claims are logically separate from the parts of those claims Plaintiff purports to assert under state law. Therefore, the Complaint necessarily raises a federal issue and is removable under *Broder*.

8.     Although Plaintiff purports to assert three claims for relief, all are based on the allegations that certain investments in the securities of non-U.S. companies by the nominal defendant violated 18 U.S.C. § 1955 and N.Y. Penal Law Article 225. The core of Plaintiff's claims is that certain "investments" by the nominal defendant were "unlawful" because the operations of the companies nominal defendant invested in — which were listed on the London Stock Exchange — "violated various federal criminal statutes and the anti-gambling laws of virtually every state in the U.S., including, without limitation, Article 225 of the N.Y. Penal Law."[3] Plaintiff pleads that the nominal defendant's *investments* "violated ... various federal and state criminal statutes."[4]

---

[3]     *See* Complaint ¶¶ 26, 27, 28, 33, 89 & 126-141. Plaintiff specifically pleads that the investments at issue in the Complaint were not listed on any market in the U.S. and could not be purchased in the U.S. *See id.* ¶ 38.

[4]     *See id.* ¶ 41. Plaintiff concedes that all the investments at issue in the Complaint were disclosed in the nominal defendant's quarterly filings with the SEC. *See, e.g., id.* ¶¶ 42, 43 & 46.

9. Although Plaintiff purports to base his claims on alleged violations of both

federal and state law, the alleged violations of federal law are the primary issues raised in the

complaint:

> (a)  18 U.S.C. § 1955 imposes criminal penalties for conducting, financing, managing, supervising, directing, or owning all or part of an "illegal gambling business."[5] Plaintiff alleges that purchasing publicly traded stock of a non-U.S. company in open market transactions on a non-U.S. exchange violates § 1955.
>
> (b)  In contrast, the New York law referred to vaguely in the Complaint is even less likely to apply to a passive investment than § 1955.[6]

10. As in *Broder*, the federal aspects of each claim in the Complaint are

separable from the state aspects, and whether Plaintiff wins or loses on the allegations that

Defendants violated federal law is entirely dependent on interpreting federal law. Put

differently, federal law determines whether alleged conduct violates § 1955 and, if so, what

consequences might follow.[7] Removal is therefore appropriate.[8]

11. Moreover, Plaintiff's proposed interpretation of federal law is

breathtakingly broad, potentially opening investors around the world to criminal and civil

---

[5]  18 U.S.C. § 1955(a).

[6]  *See, e.g.,* N.Y. PENAL LAW § 225.10 ("A person is guilty of promoting gambling in the first degree when he knowingly advances or profits from unlawful gambling activity by: 1. Engaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars; or 2. Receiving, in connection with a lottery or policy scheme or enterprise, (a) money or written records from a person other than a player whose chances or plays are represented by such money or records, or (b) more than five hundred dollars in any one day of money played in such scheme or enterprise.").

[7]  *See Burks v. Lasker*, 441 U.S. 471, 476-77 (1979); *Kelly v. Kosuga*, 358 U.S. 516, 519 (1959).

[8]  *Accord D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 101 (2d Cir.) ("an examination of the allegations contained in the complaint establishes that D'Alessio's suit is rooted in violations of federal law, which favors a finding that federal question jurisdiction exists"), *cert. denied*, 534 U.S. 1066 (2001).

-5-

liability for no more than purchasing or owning stock in a company merely because that

company might do something the federal government might deem illegal, even where the

company operates legal businesses in the jurisdiction in which it is organized, is publicly traded

on a major international stock exchange, and the stock purchases are open-market transactions.

Defendants are aware of no court decision finding that § 1955 reaches so far, and in fact

decisions suggest otherwise.[9] This case thus presents federal issues that are both substantial and

heavily disputed, with potentially national and international consequences, including how to

interpret the intended reach of § 1955 as a matter of statutory construction[10] and whether it could

be appropriate to apply § 1955 extraterritorially.[11]

---

[9]   *See U.S. v. Miller*, 22 F.3d 1075, 1077 (11th Cir. 1994) (holding that one "conducts" an illegal gambling business by performing any necessary function *in the gambling operation*, other than that of a mere bettor); *U.S. v. Murray*, 928 F.2d 1242, 1245-48 (1st Cir. 1991) (reversing convictions because of lack of evidence of substantial enough participation in operation of gambling enterprise, and noting that taking bets on one or two occasions is not substantial enough participation).

[10]   Among other things, this would implicate overriding federal interests in the proper construction of federal criminal statutes, such as the rule of lenity. *See generally Murray*, 928 F.2d at 1246 ("We are mindful of the constraints placed on the interpretation and application of criminal statutes, and we recognize that '[i]n the criminal context, courts have traditionally required greater clarity in draftsmanship than in civil contexts ... .' Furthermore, to avoid the imposition of penalties not intended by Congress, the courts have applied the doctrine of lenity when there is serious doubt as to the reach of a criminal statute. The doctrine of lenity '"rests on the fear that expansive judicial interpretations will create penalties not originally intended by the legislature."'") (internal citations omitted). Indeed, the rule of lenity directly serves two federal constitutional principles — due process and separation of powers. *See U.S. v. Wright*, 607 F.3d 708, 716-17 (11th Cir. 2010) (Pryor, J., concurring)

[11]   The Supreme Court recently held that federal securities law does not apply extraterritorially by relying on the "longstanding" principle that federal law does not apply extraterritorially: "When a statute gives no clear indication of an extraterritorial application, it has none." *See Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869, 2877-78 (2010). Here, Plaintiff has alleged that conduct clearly permitted in England — buying stock of companies validly listed on the LSE and operating in England — violates a federal criminal statute. Apart from raising questions about the extraterritorial reach of the laws Plaintiff relies on, this raises significant foreign policy questions, strengthening the conclusion that federal jurisdiction exists here. *See generally Torres v. Southern Peru Copper Corp.*, 113 F.3d 540, 542-43 (5th Cir. 1997) (foreign interests raised by case alone supported existence of federal question); *Republic of Phillipines v. Marcos*, 806 F.2d 344, 353 (2d Cir. 1986) ("Further support for holding that there is federal question jurisdiction

-6-

12. This issue has already been brought before federal courts in several other suits but has not been decided on the merits.[12] In *McBrearty*, this court dismissed RICO claims substantively identical to the ones pled in *Gamoran I*.[13] In *Seidl*, this court relied on *McBrearty* to dismiss similar RICO claims and dismissed derivative claims similar to those purportedly pled here because the plaintiff failed to make pre-suit demand.[14] Since then, additional suits have been filed against American Century Companies, Inc. on similar legal theories in federal courts in the Eastern District of California and the Western District of Missouri.[15] Federal courts have heard and continue to hear cases brought under Plaintiff's overbroad interpretation of federal anti-gambling statutes. Accepting federal jurisdiction here would simply acknowledge the federal nature of a case resting on a legal theory that has already received considerable attention from federal courts and would not upset the balance of responsibilities between state and federal courts.

13. Moreover, the federal issue presented here is a narrow question of law that, if resolved by this court, would serve as precedent for future cases. Indeed, this court's decision in *McBrearty* has served as the basis for dismissing similar claims in other cases.[16]

---

over actions having important foreign policy implications is found in the very recent case of *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), in which the Court emphasized the flexible and pragmatic considerations involved in determining federal jurisdiction in 'close' cases.").

[12] *See Seidl v. Am. Century Co.*, Inc., 08 Civ. 8857 (DLC), 2010 U.S. Dist. LEXIS 45060 (S.D.N.Y. May 7, 2010); *McBrearty v. Vanguard Grp., Inc.*, No. 08 Civ. 7650 (DLC), 2009 U.S. Dist. LEXIS 29775 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 353 Fed. Appx. 640 (2d Cir. Nov. 23, 2009), *cert. denied*, 78 USLW 3590 (2010); *Gomes v. Am. Century Co., Inc.*, No. 2:09-cv-02153-FCD/KJM, 2010 U.S. Dist. LEXIS 57400 (E.D.Cal. May 14, 2010); *Gomes v. Am. Century Co., Inc.*, No. 4:10CV00083 (W.D.Mo. filed Jan. 27, 2010).

[13] *See McBrearty*, 2009 U.S. Dist. LEXIS 29775, at *2-4.

[14] *See Seidl*, 2010 U.S. Dist. LEXIS 45060, at *9-10.

[15] *See supra* note 12.

[16] *See Seidl*, 2010 U.S. Dist. LEXIS 45060, at *9-10; *Wodka v. Causeway Capital Mgmt., LLC*,

Similarly, accepting jurisdiction here would provide future courts with precedent to resolve similar claims raising this issue, perhaps eliminating the need for removal in future cases. Ultimately, providing an answer to this federal question will help keep similar claims out of federal court, thereby preserving the division of responsibilities between state and federal courts.

14. For the reasons set forth above, the Complaint satisfies the requirements for federal jurisdiction under 28 U.S.C. § 1331. The Complaint also satisfies the requirements for federal jurisdiction under 28 U.S.C. § 1337, the other basis for federal question jurisdiction pled in *Gamoran I*. Plaintiff's allegations that the investments here at issue were "illegal" because they supposedly violated 18 U.S.C. § 1955 clearly arise under an Act of Congress regulating trade, thus giving this Court original jurisdiction.

15. Pursuant to 28 U.S.C. § 1367, the Court also has supplemental jurisdiction over any claims within the pleadings over which the Court does not have original jurisdiction.

16. Because this action has original federal question jurisdiction, this action is removable under 28 U.S.C. § 1441(a), which provides that "except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed ... to the district court of the United States ... embracing the place where such action is pending."

17. Defendants Neuberger Berman Management LLC and Neuberger Berman, LLC and nominal defendant Neuberger Berman International Fund were served with the Summons and Complaint on July 20, 2010, and the individual defendants were served the same day. Because this Notice of Removal is being filed within 30 days of the earliest date that any of the Defendants were served with the Complaint, it is timely filed under 28 U.S.C. § 1446(b).

---

Order of Dismissal, Case No. 09-02625 R (RCx) (C.D. Cal. Oct. 8, 2009).

18.     The Removing Defendants will promptly serve a copy of this Notice on

counsel for Plaintiff and will file a copy of this Notice with the Clerk of the Supreme Court of

the State of New York, County of New York, pursuant to 28 U.S.C. § 1446(d).

19.     All defendants who have been properly served concur in the removal of

this action to this Court, subject to and without waiving any defenses and rights available to

them.

20.     No other process, pleading, or order has been served on defendants in this

action.

WHEREFORE, Defendants Neuberger Berman Management LLC, Neuberger

Berman, LLC, Benjamin Segal, Milu E. Komer, Peter E. Sundman, Jack L. Rivkin, John

Cannon, Faith Colish, Martha C. Goss, C. Anne Harvey, Robert A. Kavesh, Howard A. Mileaf,

Edward I. O'Brien, William E. Rulon, Cornelius T. Ryan, Tom D. Seip, Candace L. Straight, and

Peter P. Trapp and nominal defendant Neuberger Berman International Fund respectfully request

removal of this action from the Supreme Court of the State of New York, County of New York,

to the United States District Court for the Southern District of New York.

Dated: August 19, 2010

MILBANK, TWEED, HADLEY & McCLOY    K&L GATES LLP
LLP

By: _____

James M. Benedict
jbenedict@milbank.com
Douglas W. Henkin
dhenkin@milbank.com
C. Neil Gray
cngray@milbank.com
1 Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Attorneys for Defendants Neuberger Berman
Management LLC, Neuberger Berman, LLC,
Benjamin Segal, Milu E. Komer, Peter E.
Sundman, and Jack L. Rivkin*

By: _____

Joanna A. Diakos
joanna.diakos@klgates.com
Sarah P. Kenney
sarah.kenney@klgates.com
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

*Attorneys for Defendants John Cannon, Faith
Colish, Martha C. Goss, C. Anne Harvey,
Robert A. Kavesh, Howard A. Mileaf, Edward
I. O'Brien, William E. Rulon, Cornelius T.
Ryan, Tom D. Seip, Candace L. Straight, and
Peter P. Trapp and Nominal Defendant
Neuberger Berman Equity Funds d/b/a
Neuberger Berman International Fund*

-10-

# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

BENJAMIN M. GAMORAN, derivatively on behalf of the
nominal defendant with respect to its series mutual fund,
the Neuberger Berman International Fund,

              Plaintiff,

    - against -

NEUBERGER BERMAN MANAGEMENT LLC, NEUBERGER
BERMAN, LLC, BENJAMIN SEGAL, MILU E. KOMER,
PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON,
FAITH COLISH, MARTHA C. GOSS, C. ANNE HARVEY,
ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I.
O'BRIEN, WILLIAM E. RULON, CORNELIUS T. RYAN, TOM
D. SEIP, CANDACE L. STRAIGHT, AND PETER P. TRAPP,

              Defendants,

    - and -

NEUBERGER BERMAN EQUITY FUNDS d/b/a NEUBERGER
BERMAN INTERNATIONAL FUND,

             Nominal Defendant.

Index No. **6 5 0 9 6 6 - 1 0**

**SUMMONS**

---

## TO THE ABOVE NAMED DEFENDANTS

    **YOU ARE HEREBY SUMMONED** TO answer the complaint in this
action and to serve a copy of your answer, or if the complaint is not served with this
summons, to serve a notice of appearance on the plaintiff's attorney(s) **within 20 days**
after the service of this summons, exclusive of the day of service (or within 30 days
after the service is complete if this summons is not personally delivered to you within
the State of New York); and in the case of your failure to appear, judgment will be
taken against you by default for the relief demanded in the complaint.

    New York County is designated as the venue based on plaintiff's residence
which is in New York.

This summons and complaint will be served on all defendants and nominal defendants by personal delivery to:

MILBANK, TWEED, HADLEY & MCCLOY LLP
James N. Benedict
Douglas W. Henkin
Sean M. Murphy
1 Chase Manhattan Plaza
New York, NY 10005-1413

and

K&L GATES LLP
Joanna A. Diakos
599 Lexington Avenue
New York, NY 10022

pursuant to a stipulation and order entered on May 19, 2009 in the case of Gamoran v. Neuberger Berman Management LLC Index No. 08-civ-10807 that was pending in the United States District Court, Southern District of New York.

Dated: New York, New York
July 15, 2010

HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES LLP

By: _____

Thomas J Sheridan, III
112 Madison Avenue
New York, NY 10016-7416
Telephone: (212) 784-6400
Facsimile: (212) 784-6420

ATTORNEYS FOR PLAINTIFF

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the Neuberger Berman International Fund,<br><br>Plaintiff,<br><br>- against -<br><br>NEUBERGER BERMAN MANAGEMENT LLC, NEUBERGER BERMAN, LLC, BENJAMIN SEGAL, MILU E. KOMER, PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON, FAITH COLISH, MARTHA C. GOSS, C. ANNE HARVEY, ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I. O'BRIEN, WILLIAM E. RULON, CORNELIUS T. RYAN, TOM D. SEIP, CANDACE L. STRAIGHT, AND PETER P. TRAPP,<br><br>Defendants,<br><br>- and -<br><br>NEUBERGER BERMAN EQUITY FUNDS d/b/a NEUBERGER BERMAN INTERNATIONAL FUND,<br><br>Nominal Defendant. | **VERIFIED DERIVATIVE COMPLAINT**<br><br>Index No. 650966-10 |

Plaintiff alleges:

### OVERVIEW

1.      This action arises from wrongful acts committed by the defendants ("Defendants") when they unlawfully invested money entrusted to them in illegal gambling businesses. These unlawful investments suffered significant losses when the government began arresting principals of the gambling enterprises during a law enforcement crackdown beginning in the summer of 2006.

2.      Plaintiff Benjamin M. Gamoran ("Plaintiff") is a shareholder in nominal defendant Neuberger Berman Equity Funds ("Nominal Defendant") through its Neuberger Berman International Fund portfolio (the "Fund"). He sues derivatively on behalf of the Nominal

Defendant (with respect to the Fund) to recover the money that Defendants squandered on illegal investments in criminal organizations. Plaintiff also seeks forfeiture of the over $11 million in annual fees that these faithless fiduciaries paid themselves from the Fund's assets while they criminally mismanaged the Fund.

3.     Defendants caused Nominal Defendant, through the Fund, to illegally invest in one or more entities whose primary businesses violated state and federal anti-gambling laws. These entities included 888 Holdings PLC ("888") and NETeller Plc ("NETeller").

4.     The market value of those investments plummeted after July 16, 2006, following an increase in law enforcement against illegal gambling businesses.

5.     As a reasonably foreseeable and natural consequence of Defendants' illegal investments, Nominal Defendant and the Fund's investors, including Plaintiff, suffered significant investment losses.

6.     Plaintiff asserts claims for breach of fiduciary duty, negligence, and waste.

### THE PARTIES

**PLAINTIFF**

7.     Plaintiff is a resident of New York. He purchased 713 shares of the Nominal Defendant in 2000 for investment purposes. He still owns his shares in the Nominal Defendant.

**NOMINAL DEFENDANT**

8.     Nominal Defendant is a statutory trust organized under the laws of the State of Delaware. It has a principal place of business at 605 Third Avenue, New York, New York. It is registered under the Investment Company Act of 1940 as an open-end management investment company.

9. Nominal Defendant is a "series" mutual fund. As such, it has two or more portfolios of securities, each offering a separate series or class of stock to investors. Each portfolio of a series mutual fund generally has different investment objectives, policies, practices, and risks. The shareholders of each portfolio do not participate in the investment results of any other portfolio and must look solely to the assets of their portfolio for most purposes, including redemption, liquidation, earnings, and capital appreciation. Each series of stock represents a different group of stockholders with an interest in a segregated portfolio of securities. Each separate portfolio is commonly referred to as a "fund." Such portfolios are not separate legal entities. However, they are sometimes treated as separate entities for some purposes. For example, each has a separate tax identification number. Similarly, with a few notable exceptions, the Securities and Exchange Commission ("SEC") and its staff have applied the provisions of the 1940 Act to a series fund as if the individual portfolios of that fund were separate investment companies.

10. Nominal Defendant offers a "series" of shares representing an interest in a portfolio known as the Neuberger Berman International Fund, which is referred to herein as the "Fund," though it is not a separate legal entity. In addition to the Fund, Nominal Defendant also comprises 25 other funds, none of which is a separate legal entity. Nominal Defendant has a single board of trustees, which manages all 26 of its funds. The Fund does not have a board of trustees separate from the board of Nominal Defendant.

11. Nominal Defendant, through its managers, is hostile and antagonistic to the enforcement of the claims set forth herein.

- 3 -

**DEFENDANTS**

12. Defendant Neuberger Berman Management LLC ("NBM") is an investment management company. NBM serves as investment advisor to many investment companies, including the Nominal Defendant. NBM is organized under the laws of the State of New York and maintains its principal place of business at 605 Third Avenue, New York, New York.

13. Defendant Neuberger Berman, LLC (now known as Neuberger Berman LLC) ("NB"), serves as the sub-advisor to the Nominal Defendant. NB is organized under the laws of the State of Delaware. Its principal place of business is 605 Third Avenue, New York, New York.

14. NBM and NB are subsidiaries of Neuberger Berman Holdings, LLC ("Holdings").

15. Defendant Benjamin Segal served as Vice President of NBM, Managing Director of NB, and Portfolio Manager of the Fund during all relevant times.

16. Defendant Milu E. Komer served as Vice President of NBM and Managing Director of NB from 2001 until her departure from those firms in November 2008. She served as the Associate Portfolio Manager of the Fund during all relevant times.

17. Defendant Peter E. Sundman ("Sundman") served, during all relevant times, as the Chairman of the Board and Chief Executive Officer and trustee of the Nominal Defendant. He also served as Executive Vice President of Holdings; Head of Holdings's mutual fund business; President and Director of NBM; and Managing Director or Executive Vice President of NB.

- 4 -

18. Defendant Jack L. Rivkin ("Rivkin") served during all relevant times as President and trustee of the Nominal Defendant. At all relevant times, he also served as Executive Vice President and Chief Investment Officer of Holdings; Managing Director and Chief Investment Officer or Executive Vice President of NB; and Director and Chairman of NBM.

19. Defendants John Cannon, Faith Colish, Martha C. Goss, C. Anne Harvey, Robert A. Kavesh, Howard A. Mileaf, Edward I. O'Brien, William E. Rulon, Cornelius T. Ryan, Tom D. Seip, Candace L. Straight and Peter P. Trapp (collectively, with Sundman and Rivkin, the "Trustees"), served as trustees of the Nominal Defendant during all relevant times. Sundman and Rulon are no longer are trustees of the Nominal Defendant.

## JURISDICTION AND VENUE

20. This Court has personal jurisdiction over defendants and Nominal Defendant pursuant to CPLR §§ 301 and 302.

21. Venue is proper in New York County pursuant to CPLR § 503 based on plaintiff's residence and the residence of one or more of the defendants and the Nominal Defendant.

## FACTS COMMON TO ALL CLAIMS

### THE ILLEGAL GAMBLING COMPANIES

22. 888 is an online gambling company.

23. 888 is a Gibraltar company with its principal place of business in Gibraltar.

24. The stock of 888 started trading on the London Stock Exchange in October 2005.

- 5 -

25. Included among 888's many online gaming establishments are Casino-on-Net and Pacific Poker, both of which are accessible *via* 888's centralized Internet gaming Web site.

26. During the time that Defendants made their unlawful investments, 888 derived approximately 55% of its $271 million in annual revenue illegally from bets made in the U.S. Approximately $162.2 million of 888's total revenue were generated from general casino games, and $109.8 million were generated from poker.

27. 888's principal operations violated various federal criminal statutes and the anti-gambling laws of virtually every state in the U.S., including, without limitation, Article 225 of the N.Y. Penal Law.

28. Prior to Defendants' investments, 888 had disclosed the nature of its operations, including its illegal revenue stream from U.S. gamblers. For example, in a September 1, 2005 announcement that the company issued in connection with its planned initial public offering ("IPO") of shares on the London Stock Exchange, 888 admitted that it generated over half of its revenue from the U.S.

29. In the September 1, 2005 announcement, 888 also admitted that it was "particularly exposed to legal and regulatory risks due to the level of revenue generated" from gamblers in the U.S.

30. In its 2005 Annual Report, 888 warned that "there [were] significant risks, unique to the online gaming industry, including in the USA where members of 888 generated 55% of our Net Gaming Revenue in 2005." The company also noted that there were Congressional efforts to choke off the ability of online gambling companies to process financial transactions.

- 6 -

31. Like 888, NETeller's primary source of revenue was from illegal online gambling in the U.S.

32. NETeller generated 90% of its revenue by unlawfully transferring funds and processing payments for the illegal U.S.-facing operations of the online gambling industry.

33. Based in the Isle of Man, NETeller first traded on the Alternative Investment Market ("AIM") of the London Stock Exchange in April 2004.

34. NETeller disclosed in its April 8, 2004 prospectus in connection with an initial public offering ("IPO") of its securities that its operations violated U.S. federal and state gambling laws.

35. On January 15, 2007, NETeller's founders were arrested and charged with conspiracy to violate various federal and state anti-gambling laws in connection with operating NETeller, including 18 U.S.C. § 1955 and Article 225 N.Y. Penal Law (illegal gambling). They later pleaded guilty to various felonies in connection with operating NETeller, including § 1955. They also agreed to personally forfeit $100 million in criminal proceeds.

36. The federal government also proceeded against NETeller itself. A January 1, 2007 Information charged NETeller with conspiracy to violate various gambling-related laws, including § 1955. Pursuant to a July 17, 2007 Deferred Prosecution Agreement with the United States Attorney's Office for the Southern District of New York ("the USAO"), NETeller admitted to criminal wrongdoing and agreed to forfeit $136 million in criminal proceeds. NETeller also admitted that 88% of its customers were North American residents, the majority of which were U.S. residents. NETeller stipulated that in 2005, it generated over $120 million in illegal revenue from U.S. residents. The felony Information specifying the charges against

- 7 -

NETeller; a Statement of Admitted Facts by NETeller; and the Deferred Prosecution Agreement, were accepted by United States District Judge P. Kevin Castel.

37. NETeller's business also violated the anti-gambling laws of virtually every state in the U.S. For example, NETeller violated N.Y. Penal Law § 225.05, because NETeller "knowingly advance[d] or profit[ed] from unlawful gambling activity." New York courts have long recognized that Internet gambling in general, even when conducted by a foreign corporation, is unlawful gambling activity under § 225.05. *See People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc.2d 852 (N.Y. Sup. Ct. 1999) (Ramos, *J.*).

38. Even though the majority of 888's and NETeller's revenue was from U.S. gamblers, to evade the reach of the U.S. criminal justice system, they did not offer their shares for sale to, or for the benefit of, persons in the U.S. They did not list its shares to be traded on any U.S. exchange through American Depository Receipts or otherwise because the DOJ considered the companies to be illegal gambling businesses. Because shares of 888 and NETeller could not be purchased in the U.S.. Defendants had to purchase shares overseas to circumvent these restrictions.

## THE INVESTMENTS

39. Each of the Defendants is a person employed by or associated with the Nominal Defendant.

40. Each of the Defendants had operational or managerial control over the Nominal Defendant.

41. Each of Defendants knowingly developed and implemented (or conspired to develop and implement) an investment strategy pursuant to which Nominal Defendant was caused to purchase shares in illegal gambling businesses. By causing Nominal Defendant to

- 8 -

purchase, through the Fund, stock in illegal gambling businesses, Defendants violated, and caused Nominal Defendant to violate various federal and state criminal statutes.

42.     Between December 1, 2005 and February 28, 2006, Defendants caused the Nominal Defendant, through the Fund, to purchase a total of 3,891,590 shares of 888. As of February 28, 2006, these shares had a value of $13,497,000. *See* Semi-Annual Report filed by Nominal Defendant with the SEC on May 8, 2006 for the period ending February 28, 2006.

43.     Between March 1, 2006 and May 31, 2006, Defendants caused Nominal Defendant, through the Fund, to acquire additional shares of 888 in one or more separate transactions. By the end of this period, Nominal Defendant owned 4,689,780 shares of 888 with a market value of $18,470,000. *See* Quarterly Report filed by Nominal Defendant with the SEC on July 28, 2006 for the period ending May 31, 2006.

44.     By August 31, 2006, Nominal Defendant owned, through the Fund, a total of 4,581,420 shares of 888 with a market value of $13,281,000. *See* Certified Shareholder Report filed by Nominal Defendant with the SEC on November 6, 2006 for the period ending August 31, 2006.

45.     Between September 1, 2006 and November 30, 2006, Defendants caused Nominal Defendant to sell all of its shares of 888.

46.     Between September 1, 2005 and November 30, 2005, Defendants caused Nominal Defendant, through the Fund, to purchase a total of 465,170 shares of NETeller. As of November 30, 2005, these shares had a market value of $5,149,000. *See* Quarterly Report filed by Nominal Defendant with the SEC on January 30, 2006 for the period ending November 30, 2005.

- 9 -

47. Between December 1, 2005 and February 28, 2006, Defendants caused Nominal Defendant, through the Fund, to purchase additional shares of NETeller in one or more transactions. By the end of this period, Nominal Defendant owned 1,530,620 shares of NETeller with a market value of $20,188,000. *See* Semi-Annual Report filed by Nominal Defendant with the SEC on May 8, 2006 for the period ending February 28, 2006.

48. Between March 1, 2006 and May 31, 2006, Defendants caused Nominal Defendant, through the Fund, to purchase additional shares of NETeller in one or more separate transactions. By the end of this period, Nominal Defendant owned 2,161,078 shares of NETeller with a market value of $25,422,000. *See* Quarterly Report filed by Nominal Defendant with the SEC on July 28, 2006 for the period ending May 31, 2006.

49. Between June 1, 2006 and August 31, 2006, Defendants caused Nominal Defendant, through the Fund, to purchase additional shares of NETeller. By the end of this period, Nominal Defendant owned 2,377,483 shares with a market value of $18,922,000. *See* Certified Shareholder Report filed by Nominal Defendant with the SEC on November 6, 2006 for the period ending August 31, 2006.

50. Between September 1, 2006 and November 30, 2006, Defendants caused Nominal Defendant to sell all of its shares of NETeller.

51. Defendants' investments in NETeller and 888 were neither passive nor short term.

52. In a report filed with the SEC on August 31, 2006, Nominal Defendant reported that on May 11, 2006, it attended and voted by proxy at the annual meeting for NETeller. Defendants caused Nominal Defendant to vote in favor of various actions recommended by NETeller's management, including the election of directors.

- 10 -

53. In the same August 31, 2006 report, Nominal Defendant reported that on May 19, 2006, it attended and voted by proxy at the annual meeting of 888. Defendants caused Nominal Defendant to vote for thirteen of 15 proposals recommended by 888's management, including the election of directors and remuneration of executives.

54. The directors and executives whom Defendants caused Nominal Defendant to vote for and to compensate were all engaged in operating NETeller and 888 as illegal gambling businesses in violation federal law and the anti-gambling laws of virtually all the states in the U.S. Defendants knew, or were reckless in not knowing, that the directors and executives for whom they voted to elect and compensate all intended to continue operating NETeller and 888 as illegal gambling businesses after the annual meeting.

55. At all times prior to and including July 15, 2006, Defendants intended to cause Nominal Defendant – an open-ended investment company – to continue its ownership of illegal gambling businesses indefinitely but were disrupted from doing so by law enforcement activity.

### DEFENDANTS' KNOWLEDGE OF THE ILLEGALITY

56. Defendants conducted or caused to be conducted, or were reckless in failing to conduct or to cause to be conducted, due diligence before the Nominal Defendant, through the Fund, purchased shares in the illegal gambling businesses.

57. Through numerous publicly-available sources of information, including, without limitation, news media, government sources, and information provided by the illegal gambling companies themselves, at the time of the investments complained of herein, Defendants knew, or were reckless in not knowing and therefore are deemed to have known, that

- 11 -

the illegal gambling businesses in which they caused Nominal Defendant to invest were taking bets from gamblers in the United States, or processing payments relating to such bets.

58. At the time of the investments complained of herein, it was well-established that gambling businesses operating outside the United States violated U.S. criminal law when they take wagers from gamblers in the U.S. or process payments relating to those wagers.

59. Jay Cohen was convicted in February 2000 of running an Internet gambling business. On appeal, the United States Court of Appeals for the Second Circuit held that Cohen and his organization, an Antiguan corporation that took bets over the Internet from gamblers in New York, violated the Wire Gambling Act, 18 U.S.C. § 1084, whenever there "was a telephone call or an internet transmission between New York and [defendant] in Antigua" that facilitated a bet or wager on a sporting event. *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001).

60. At the time of the investments complained of herein, it was also well-established that gambling businesses operating outside the United States may violate the criminal laws of individual states when they take wagers from gamblers in those states.

61. In *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc.2d 852 (N.Y. Co. Sup. Ct. 2000) (Ramos, J.), the New York State Supreme Court held that Cohen's company engaged in illegal gambling activity in violation of New York state law.

62. In *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), the United States Court of Appeals for the Second Circuit affirmed a 2003 conviction under 18 U.S.C. § 1955 predicated on a violation of Article 225 of the N.Y. Penal Law, holding that "[w]hen bets are placed from New York, the gambling activity is illegal under New York law, regardless of whether the activity is legal in the location to which the bets were transmitted." 459 F.3d at 340.

63. In *State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, No. CV-97-7808, 1997 WL 33545763 (Mo. Cir. Ct., Greene Co., May 23, 1997), the court held that a foreign business violates Missouri criminal statutes, including state anti-gambling laws, when it provides gambling-related services to a Missouri resident over the Internet.

64. In October 2001, New Jersey filed enforcement proceedings against various online gaming entities, including Sportingbet Plc ("Sportingbet"), for violating New Jersey's gambling laws.

65. In October 2001, Gold Medal Sports, an online sportsbook located in Curacao, and its principals, pleaded guilty to racketeering in a criminal case brought by the United States Attorney for the Western District of Wisconsin.

66. In April 2002, based on pressure brought by the Attorney General of New York, PayPal, the world's largest electronic payment processor, agreed to halt financial transactions on behalf of online gambling companies, which were taking bets from gamblers in New York in violation of New York state law. Banks, including Citibank, also settled claims brought by the New York State Attorney General by agreeing to halt payment processing for unlawful Internet gambling businesses.

67. In 2003, the United States Department of Justice ("DOJ") issued public warnings that Internet gambling companies that take wagers from gamblers in the U.S. were criminal organizations – and cautioned the public that supporting them was itself a crime.

68. In March 2003, the United States brought suit against PayPal in Missouri for facilitating unlawful gambling activity. In July 2005, PayPal agreed to pay the federal government $10 million in penalties.

- 13 -

69.     In April 2004, the federal government seized over 6 million dollars that PartyGaming Plc ("PartyGaming") (an illegal gambling business) had paid Discovery Communications (the television and media company that owns the Travel Channel) and other media companies for advertising.

70.     NETeller disclosed to Defendants in its April 8, 2004 prospectus that the "view of the US Department of Justice" was that NETeller's principal operations violated various criminal statutes in the U.S. and that there "could be no assurance that the US will not threaten or try to prosecute the NETeller Group under federal law at some stage under existing or future regulations."

**LAW ENFORCEMENT**

71.     On June 1, 2006, a US grand jury indicted London-based BetOnSports Plc ("BetOnSports") – another unlawful Internet gambling business – for racketeering, mail fraud and running an illegal gambling enterprise because it was accepting wagers from U.S. bettors in violation of U.S. law.

72.     The indictment was filed under seal, so investors did not learn about it until July 16, 2006, when BetOnSports' Chief Executive Officer, David Carruthers, was arrested by U.S. law enforcement. *United States v. BetOnSports Plc*, 4:06-CR-00337-CEJ (E.D. Mo.). The grand jury also indicted BetOnSports founder Gary Kaplan, its Chief Executive Officer David Carruthers, and twelve others. Also at that time, a federal district judge in Missouri, in a companion civil RICO action, issued a temporary restraining order against BetOnSports enjoining it from "operating an illegal gambling business through Internet web sites and telephone services." *United States v. BetOnSports Plc*, 4:06-CV-01064 CEJ (E.D. Mo.).

- 14 -

73.     The share prices of illegal gambling companies, including 888 and NETeller, plummeted in the wake of this law enforcement crackdown.

74.     On or about September 8, 2006, Sportingbet's Chairman, Peter Dicks, was arrested at Kennedy Airport on a Louisiana state warrant on gambling-related charges. This caused the share prices of the illegal gambling companies, including 888 and NETeller, to drop even further.

75.     Shortly after Dicks' arrest, on September 15, 2006, French law enforcement authorities arrested Bwin's co-chief executives Norbert Teufelberger and Manfred Bodner on gambling-related criminal charges.

76.     The U.S. government's increased enforcement actions directed against illegal Internet gambling included, but were not limited to, criminal and civil enforcement actions like those referred to above and legislative changes intended by Congress to make it more difficult for illegal Internet gambling businesses to circumvent existing laws.

77.     One way Congress sought to make it more difficult for illegal Internet gambling businesses to circumvent existing laws was to restrict their ability to transfer funds and choke off their source of revenue. Such efforts included passage of the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* (the "UIGE").

78.     The UIGEA did not make any gambling activity illegal that had previously been legal. On the contrary, the statute expressly provided that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting or regulating gambling within the United States." 31 U.S.C. § 5361(b). Thus, the UIGE simply made it more difficult for existing illegal gambling businesses to operate by making it unlawful to transfer funds to or from such entities.

- 15 -

79. Soon after passage of the UIGE, 888 withdrew from the U.S. gambling market completely.

80. As alleged above, in January 2007, the federal government arrested the founders of NETeller – who were fugitives from the law – when their plane arrived in the U.S. Virgin Islands. After these arrests, NETeller finally withdrew from the U.S. market and changed its name to Neovia Financial PLC.

81. In 2008, one of PartyGaming's founders, Anurag Dikshit, pleaded guilty to gambling offenses in the Southern District of New York. Under his plea agreement, Dikshit agreed to forfeit $300 million in criminal proceeds and face a possible two-year prison sentence.

82. At all relevant times, the nature of 888's and PartyGaming's operations in the United States were identical for all relevant legal purposes.

83. In April 2009, PartyGaming entered into a non-prosecution agreement with the United States Attorney for the Southern District of New York in which it agreed to forfeit $105 million in criminal proceeds because its principal business (constituting approximately 87% of its revenue) violated several federal criminal statutes, including § 1955.

84. On January 8, 2010, Carruthers was sentenced by Judge Jackson to 33 months imprisonment. Previously, Judge Jackson sentenced BetOnSports founder Gary Kaplan to 51 months in jail and ordered him to forfeit $43,650,000 in criminal proceeds. Judge Jackson also accepted a guilty plea by BetOnSports to racketeering conspiracy and ordered the company to forfeit $28,200,000 in criminal proceeds.

- 16 -

THE LOSSES

85.     Predictably, the share prices of gambling companies that had been illegally taking bets from gamblers in the US – including 888 and NETeller – fell dramatically during the increased law enforcement beginning in July 2006, including after the arrests of Internet gambling executives and passage of the UIGE.

86.     Prior to June 2006, 888's share price was between 200 and 250 pence (approximately $4 to $5) per share.

87.     In October 2006, 888 announced that it would halt its US operations, and its share price dropped below 100 pence.

88.     At the beginning of June 2006, NETeller's share price was over 700 pence (approximately $14) per share. After the arrests of NETeller's founders, trading in NETeller's shares was suspended, having last traded on January 15, 2007 at approximately $3.25 per share. After the DOJ shut down NETeller's U.S. operations, NETeller resumed trading on July 25, 2007, at approximately $1.20 per share.

89.     Defendants' illegal investments, all of which were purchased for the Fund's portfolio, directly injured Nominal Defendant through its Fund portfolio. In addition, because the value of shares in the Fund is calculated daily on the basis of the net asset value of the Fund's portfolio, each dollar lost by Defendants' investments in an illegal gambling business resulted in a dollar loss to the Fund's investors, including Plaintiff. At the same time, the general market for securities of the type in which Nominal Defendant invested through the Fund rose during the period that Nominal Defendant, through the Fund, suffered the losses complained of in this complaint.

- 17 -

90. The losses suffered by Nominal Defendant through its Fund portfolio were a direct, proximate, reasonably foreseeable, and natural consequence of Defendants causing Nominal Defendant, through the Fund, to own part of an illegal gambling business.

91. Defendants' wrongful actions investing in illegal gambling were the efficient, material, substantial, and proximate cause of the loss suffered by Nominal Defendant in the Fund's portfolio. Any other cause that may have contributed to the loss, including law enforcement efforts or the market reaction to those efforts, was not a superseding cause of the losses because it was reasonably foreseeable and part of the risk that Defendants' wrongful acts created.

92. Defendants' conduct has been willful, wanton or reckless.

### ALLEGATIONS COMMON TO ALL DERIVATIVE CLAIMS

93. With respect to all derivative claims alleged herein, no demand for relief has been made upon the board of trustees because:

    a. A majority of the board of trustees of Nominal Defendant have disabling interests and lack independence;

    b. any demand would be futile because granting such demand would create a substantial likelihood of criminal and civil liability for the Trustees; and

    c. the challenged transactions are *ultra vires* and outside the scope of lawful business judgment, and any decision to prohibit Plaintiff from vindicating the rights of Nominal Defendant with respect to the Fund would not be protected by the business judgment rule.

94. To an even greater degree than directors of ordinary corporations, mutual fund directors, including the Trustees, are responsible for protecting Nominal Defendant's

- 18 -

shareholders under a unique watchdog role. Thus, each of the Trustees had a special duty to ensure that the funds over which they served a watchdog role did not invest in illegal gambling businesses.

95. The Trustees also had a duty to ensure that Nominal Defendant had proper control mechanisms to ensure that they did not make any investments in any illegal gambling businesses.

96. The Trustees had a duty to oversee the actions of the investment advisor and sub-advisor and review the actions of the Nominal Defendant's officers.

97. Upon information and belief, the Trustees received regular reports regarding the Fund's investments.

98. The Fund's investments were listed in the Fund's SEC reports, which, upon information and belief, the Trustees reviewed.

99. The Trustees had a duty to review the trading activities and strategies used to manage Fund assets.

100. If any Trustee remained ignorant of the illegal investments complained of herein, then such ignorance was the result of recklessness.

101. As part of its role as investment adviser, NBM selects the persons who serve on Nominal Defendant's board of trustees, including the Trustees. Accordingly, the relationship between the Trustees and Nominal Defendant is fraught with conflicts of interest. Because a demand in this case would require the Trustees to cause Nominal Defendant to sue NBM, NB and the Trustees, the Trustees are inherently conflicted from exercising independent and disinterested business judgment.

- 19 -

102. Pre-suit demand upon the Trustees would have been futile because the Trustees could not have properly exercised their independent and disinterested business judgment in responding to a demand. Not only were they exposed to civil and criminal liability, but the relationship between the Trustees, the Nominal Defendant and NBM and NB creates a conflict of interest that creates a strong presumption against board independence and disinterest.

103. Each of the derivative claims asserted by Plaintiff in this action against Defendants was previously asserted by Plaintiff against the same defendants in an action captioned *Gamoran v. Neuberger Berman Management LLC, et al.*, Docket Number 08 Civ. 10807 (DLC), filed in the United States District Court for the Southern District of New York ("*Gamoran I*"). Each of Defendants acknowledged service of the summons and complaint in *Gamoran I. Gamoran I* was voluntarily dismissed pursuant to a stipulation of the parties and an order of the court entered May 19, 2009 that provided, *inter alia*, that:

  a. The dismissal was without prejudice.

  b. If Plaintiff commenced a new action based on the transactions and occurrences or series of transactions and occurrences that are the subject of the complaint in *Gamoran I*, and if such new action is commenced sooner than the date which is six (6) months from January 20, 2010 (the date of the issuance of the mandate of the United States Court of Appeals for the Second Circuit *McBrearty v. Vanguard Group, Inc.*, No. 09-1445-cv) then:

    i. The date of commencement of the new action shall relate back to the date of commencement of *Gamoran I* (i.e., December 12, 2008); and

    ii. The operative date for determining the adequacy of Plaintiff's compliance with any demand or similar requirement for maintaining the action as a derivative action shall relate back to the date of commencement of *Gamoran I*: and

- 20 -

iii. Service of process on the Defendants and Nominal Defendants in the subsequent action shall be made by personal delivery of the summons and complaint to the defense counsel in *Gamoran I*, and such service shall be deemed good and sufficient for all purposes, but without prejudice to any defense any defendant or nominal defendant may have based on lack of *in personam* jurisdiction, except that the operative date for determining *in personam* jurisdiction shall relate back to the date of commencement of *Gamoran I*; and

iv. Any period of limitations (including laches) applicable to the claims asserted in the complaint in this action shall be tolled from the date *Gamoran I* was commenced until the date six (6) months after January 20, 2010.

104. Since they were served with the summons and complaint in *Gamoran I* in 2008, Defendants have taken no steps to prosecute the claims asserted herein, which confirms that any demand that Plaintiff might have made upon them prior to December 12, 2008 to prosecute such claims would have been futile.

105. Demand on the Nominal Defendant's board of trustees is also futile because each and every member of board of trustees of Nominal Defendant would face an inherent conflict of interest in responding to a demand. Vindication of the rights of investors in the Fund against NB and NBM is contrary to the interests of shareholders of other funds on whose behalf the trustees also serve and to whom they also owe a duty of undivided loyalty.

106. The Fund is one of 26 "series" of shares offered by Nominal Defendant.

107. None of Nominal Defendant's 26 "funds" is a separate legal entity.

108. Nominal Defendant has a single board of trustees, which manages all 26 of its funds.

109. NBM and NB serves as investment advisors or sub-advisors to all 26 of the series funds offered by Nominal Defendant.

- 21 -

110. The trustees of Nominal Defendant have separate fiduciary obligations, including a duty of undivided loyalty, to each group of shareholders in all 26 of the funds offered by Nominal Defendant, including the Fund.

111. The trustees' conflict arises because, while the assertion of the claims at issue is in the best interest of shareholders who invested in the Fund, it is not in the best interests of shareholders who invested in the other 25 funds that did not invest in illegal gambling businesses. Any significant judgment against NB or NBM could adversely affect the shareholders who invested in those 25 other funds.

112. The interests of the investors in the other 25 funds are antagonistic to those of the investors in the Fund because, under their management and sub-advisory agreements with Nominal Defendant, NB and NBM are obligated to provide each of the 26 series mutual funds that constitute Nominal Defendant certain administrative services, office space, equipment, facilities and personnel competent to perform all of the series funds' executive, administrative and clerical functions.

113. NB and NBM are responsible for providing or arranging for all services necessary for the operation of all the separate funds that compose Nominal Defendant. NB and NBM obtain the funds to pay for all such operational expenses and overhead in large part from the fees allocated to the Fund.

114. Were the Plaintiffs to prevail in this litigation, NB and NBM would be liable to forfeit all of the fees they have received on account of their management of the Fund's portfolio from the time that Defendants first caused Nominal Defendant to purchase shares in illegal gambling businesses. NB and NBM would also be liable for the money Defendants squandered on illegal gambling businesses. In that event, NB and NBM would be unable to

- 22 -

continue covering the operational expenses and overhead of the other 25 funds that compose Nominal Defendant. As a result, it is contrary to the interests of investors in the other 25 funds for Plaintiff to succeed in this action. All of the trustees therefore have an irreconcilable conflict of interest with respect to any decision to vindicate the rights of the Fund against NB, NBM, or any other Defendant.

115. The Trustees have served as trustees of Nominal Defendant since at least 2004. Accordingly, the Trustees served on the Board of Trustees of the Nominal Defendant during the time that Defendants caused Nominal Defendant to invest in the illegal gambling businesses and were members of the conspiracy alleged herein.

116. The Trustees each faced a substantial threat of personal civil and criminal liability for causing, allowing, or permitting the investments in illegal gambling businesses.

117. In view of their actions, the Trustees face a substantial risk of criminal liability if this litigation proceeds given the following facts, among others:

> a. As reported by the *New York Times* on December 25, 2005, one of the primary Congressional sponsors of the UIGE (Rep. Goodlatte of VA) has warned that if "investment houses are knowingly supporting and promoting illegal [Internet gambling] enterprises [that would be] very bad, and the Congress ought to investigate it."
>
> b. The DOJ issued public warnings that Internet gambling companies are criminal organizations and that supporting such criminal organizations was itself a crime.
>
> c. The United States Attorney for the Southern District of New York stated, in connection with the prosecution of NETeller that "[s]upporting illegal gambling is not a business risk, it is a crime." *See* July 18, 2007 Press Release from the USAO.
>
> d. Discovery Communications was subject to a large asset seizure by the DOJ merely for taking advertising money from an illegal gambling business.

- 23 -

118. In light of the government's attitude towards those who provide support for illegal Internet gambling and the fact that executives and directors have been prosecuted in connection with off-shore Internet gambling companies, Trustees must be concerned that they, too, may face prosecution were the circumstances surrounding Nominal Defendant's investment in illegal gambling businesses fully revealed during this litigation.

119. The threat that an investigation will uncover additional evidence that could expose the Trustees to criminal and civil liability is particularly strong in this case. Defendants are likely to have detailed non-public documentary evidence, currently unavailable to Plaintiff or his fellow investors, that provides information regarding what was known, and what was done, by each of the Defendants with respect to the investments in illegal gambling businesses.

120. Defendants cannot be indemnified, by insurance, by Nominal Defendant, by the Fund, or by any other person for their personal financial liability or for other serious wrongdoing because that would be contrary to public policy.

121. Finally, any decision by the Trustees to terminate this litigation or would be tantamount to condoning inherently illegal criminal activity that is *ultra vires* and a *per se* violation of the business judgment rule. Accordingly, any adverse decision by the Trustees to bar Plaintiff from vindicating the rights of Nominal Defendant with respect to the Fund would not be protected by the business judgment rule, thus rendering any demand on the board futile.

122. Plaintiff was a shareholder of Nominal Defendant, through his interests in the Fund, at the time of the transactions of which he complains.

123. Plaintiff is still a shareholder in Nominal Defendant.

124. This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

125. Plaintiff will fairly and adequately represent the interests of Nominal Defendant with respect to the Fund.

## FIRST CLAIM FOR RELIEF
## (DERIVATIVE CLAIM)
## (BREACH OF FIDUCIARY DUTY)

126. Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

127. This claim is brought by Plaintiff on behalf of Nominal Defendant with respect to the Fund against all Defendants.

128. Defendants have breached their fiduciary duties to Nominal Defendant by causing Nominal Defendant, through the Fund, to invest in illegal gambling businesses.

129. Nominal Defendant, through the Fund, has been injured as a proximate and reasonably foreseeable result of such breach on the part of Defendants and have suffered substantial damages thereby, including, without limitation, the loss in value of its investments and the payment, directly or indirectly, of commissions, fees and other compensation received by Defendants from the time that they first breached their fiduciary duties.

## SECOND CLAIM FOR RELIEF
## (DERIVATIVE CLAIM)
## (NEGLIGENCE)

130. Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

131. This claim is brought by Plaintiff on behalf of Nominal Defendant with respect to the Fund against all Defendants.

132. Defendants' actions constituted negligence in that they breached a duty of care owed to Nominal Defendant. the Fund and the Fund's investors to exercise reasonable care with respect to the Fund's investments.

- 25 -

133.     Defendants breached their duty of care to Nominal Defendant, the Fund and the Fund's investors by causing Nominal Defendant, through the Fund, to invest in illegal gambling businesses.

134.     Nominal Defendant, through the Fund, has been injured as a proximate result of Defendants' negligence and has suffered substantial damages thereby, including, without limitation, the loss in value of its investments and the payment, directly or indirectly, of commissions, fees and other compensation received by Defendants from the time that they first breached their fiduciary duties.

## THIRD CLAIM FOR RELIEF
## (DERIVATIVE CLAIM)
## (WASTE)

135.     Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

136.     This claim is brought by Plaintiff on behalf of Nominal Defendant with respect to the Fund against Defendants.

137.     Defendants each had a duty to Nominal Defendant, the Fund and the Fund's investors to prevent waste of Nominal Defendant's assets with respect to the Fund.

138.     Defendants each breached their duties to prevent the waste of Nominal Defendant's assets with respect to the Fund.

139.     Using Fund assets to illegally purchase shares of unlawful gambling organizations constitutes a waste of assets.

140.     Use of corporate assets in violation of federal and state criminal laws is *per se ultra vires* and not a permissible exercise of business judgment.

- 26 -

141. Nominal Defendant, through the Fund, has been injured as a proximate result of Defendants' waste and has suffered substantial damages thereby.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays that, upon the trial of this action, Plaintiff recovers for the Nominal Defendant with respect to the Fund, from each Defendant, jointly and severally, as follows:

    a.    Compensatory damages for the Nominal Defendant on behalf of the Fund representing the reduction in value of its investments resulting from Defendants' wrongful conduct, in an amount estimated to be $30 million;

    b.    Forfeiture and disgorgement of any commissions, fees or profits received by Defendants from the time of their first wrongful conduct, in an amount estimated to be $11 million;

    c.    Punitive damages;

    d.    Recovery of Plaintiff's attorney's fees, expert witness fees, and costs and disbursements of suit;

    e.    Pre-judgment and post-judgment interest; and

- 27 -

Case 1:10-cv-06234-LBS   Document 1   Filed 08/19/10   Page 41 of 48

f.    Such other and further relief to which Plaintiff is deemed entitled

by the Court and/or the jury.

Dated: July 15, 2010

$\overline{/\angle \sigma_5 \; \overline{L}. \; \overline{\zeta}\angle\angle \; \overline{\mathcal{W}}}$

Thomas I. Sheridan, III
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6400—Phone
tsheridan@hanlyconroy.com

- and -

SIMMONSCOOPER LLC
707 Berkshire Blvd.
East Alton, Illinois 62024
(618) 259-2222—Phone
kbrennan@simmonscooper.com

*Attorneys for Plaintiff*

- 28 -

## VERIFICATION

Benjamin M. Gamoran hereby verifies, under penalty of perjury, that the foregoing complaint is true and correct to the best of his knowledge information and belief, formed after reasonable inquiry.

Executed: July **14**, 2010

Benjamin M. Sarurvay

Benjamin M. Gamoran

Notary Public: Sworn to before
me this 14th day of July, 2010

Julio A. Lucama

JULIO A. LUCENA
Notary Public, State of New York
No. 01LU4999280
Qualified in New York County
Commission Expires July 20, 2000
2010

# EXHIBIT B

**FILED: NEW YORK COUNTY CLERK 07/28/2010**

NYSCEF DOC. NO. 3

INDEX NO. 650966/2010

RECEIVED NYSCEF: 07/28/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

BENJAMIN M. GAMORAN, derivatively on behalf of the
nominal defendant with respect to its series mutual fund,
the Neuberger Berman International Fund,

                Plaintiff,

    - against -

NEUBERGER BERMAN MANAGEMENT LLC, NEUBERGER
BERMAN, LLC, BENJAMIN SEGAL, MILU E. KOMER,
PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON,
FAITH COLISH, MARTHA C. GOSS, C. ANNE HARVEY,
ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I.
O'BRIEN, WILLIAM E. RULON, CORNELIUS T. RYAN, TOM
D. SEIP, CANDACE L. STRAIGHT, AND PETER P. TRAPP,

              Defendants,

    - and -

NEUBERGER BERMAN EQUITY FUNDS d/b/a NEUBERGER
BERMAN INTERNATIONAL FUND,

           Nominal Defendant.

---

Index No. 650966-10

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK     )
                     : ss.:
COUNTY OF NEW YORK   )

    Glenn Sanders, being duly sworn, deposes and says: I am over the age of 18 years

and not a party to this action. I am employed with the law office of HANLY CONROY

BIERSTEIN SHERIDAN FISHER & HAYES LLP, located at 112 Madison Avenue,

New York, NY 10016.

    On the 20th day of July, 2010, I served a true copy of the following:

- **Summons and Verified Derivative Complaint.**

On all defendants and nominal defendants by personal delivery to:

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005-1413

and

K&L GATES LLP
599 Lexington Avenue
New York, NY 10022

pursuant to a stipulation and order entered on May 19, 2009 in the case of Gamoran v.

Neuberger Berman Management LLC Index No. 08-civ-10807 that was pending in the

United States District Court, Southern District of New York.

Glenn a Sanders
Glenn Sanders

Sworn to before me this
27th day of July, 2010

Notary Public

JULIO A. LUCENA
Notary Public, State of New York
No. 01LU4999280
Qualified in New York County
Commission Expires July 20, 2094
2514

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------x

BENJAMIN M. GAMORAN, derivatively on        :
behalf of the nominal defendant with respect to  :
it series mutual fund, the Neuberger Berman        :
International Fund,                                               :
                                                                          :
                    Plaintiff,                                      :
                                                                          :
          -against-                                                :
                                                                          :
NEUBERGER BERMAN MANAGEMENT       :
LLC, NEUBERGER BERMAN, LLC,                   :
BENJAMIN SEGAL, MILU E. KOMER,            :
PETER E. SUNDMAN, JACK L. RIVKIN,        : Index No.: 650966-10
JOHN CANNON, FAITH COLISH, MARTHA :
C. GOSS, C. ANNE HARVEY, ROBERT A.      : **STIPULATION EXTENDING TIME TO**
KAVESH, HOWARD A. MILEAF, EDWARD :  **RESPOND TO COMPLAINT**
I. O'BRIEN, WILLIAM E. RULON,                    :
CORNELIUS T. RYAN, TOM D. SEIP,             :
CANDACE L. STRAIGHT, AND PETER P.       :
TRAPP.                                                               :
                                                                          :
                    Defendants.                                  :
                                                                          :
          -and-                                                      :
NEUBERGER BERMAN EQUITY FUNDS        :
d/b/a NEUBERGER BERMAN                         :
INTERNATIONAL FUND,                              :
                                                                          :
                    Nominal Defendants             :

----------------------------------------------------------x

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned,

that the time in which the Defendants and Nominal Defendants may answer, move or

otherwise respond with respect to the Summons or Complaint in the above-captioned

matter be and hereby is extended to and including October 8, 2010.

Dated: August 4, 2010

HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP

By: _____
  Thomas I. Sheridan, III
112 Madison Avenue
New York, New York 10016-7416
(212) 784-6400

Attorneys for Plaintiff

K&L GATES LLP

By: _____
  Joanna A. Diakos
  Sarah P. Kenney
599 Lexington Avenue
New York, New York 10022
(212) 536-3900

Attorneys for Defendants John Cannon,
Faith Colish, Martha C. Goss, C. Anne
Harvey, Robert A. Kavesh, Howard A.
Mileaf, Edward I. O'Brien, William E.
Rulon, Cornelius T. Ryan, Tom D. Seip,
Candace L. Straight, and Peter P. Trapp
and Nominal Defendants Neuberger
Berman Equity Funds d/b/a Neuberger
Berman International Fund

MILBANK, TWEED, HADLEY &
MCCLOY LLP

By: _____
  Douglas W. Henkin
1 Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

Attorneys for Defendants Neuberger
Berman Management LLC, Neuberger
Berman LLC, Benjamin Segal, Milu E.
Komer, Peter E. Sundman, and Jack L.
Rivkin