**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BENJAMIN M. GAMORAN, derivatively on behalf
of the nominal defendant with respect to its
series mutual fund, the Neuberger Berman
International Fund,

                Plaintiff,

      - against -

NEUBERGER BERMAN MANAGEMENT LLC, *et al.*,

                Defendants,

      - and -

NEUBERGER BERMAN EQUITY FUNDS d/b/a
NEUBERGER BERMAN INTERNATIONAL FUND,

                Nominal
                Defendant.

10 Civ. 6234 (LBS) (MHD)

ECF Case

---

## MEMORANDUM OF LAW IN SUPPORT OF THE INVESTMENT ADVISER DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

James N. Benedict
Douglas W. Henkin
C. Neil Gray
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

Attorneys for Defendants Neuberger Berman
    Management LLC, Neuberger Berman LLC,
    Benjamin Segal, Milu E. Komer, Peter E.
    Sundman, and Jack L. Rivkin

# TABLE OF CONTENTS

**Page**

GLOSSARY OF DEFINED TERMS ............................................................................ iii

TABLE OF AUTHORITIES ...................................................................................... v

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND AND RELATED ACTIONS ......................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

    A.  The Parties ........................................................................................................ 2

    B.  Plaintiff's Claims ............................................................................................. 3

    C.  Plaintiff's Allegations and About-Face Concerning Demand ........................... 4

ARGUMENT ............................................................................................................ 5

I.        STANDARD OF REVIEW ............................................................................. 5

II.      CHOICE OF LAW ......................................................................................... 6

III.     THE COMPLAINT FAILS TO STATE A CLAIM ...................................... 6

    A.  The Complaint Fails to Plead that Defendants Violated Any Law ................... 6

        1.  The Fund's Investments Did Not Violate § 1955 ...................................... 7

           a.  No Authority Has Interpreted § 1955 to Apply to Owners of Publicly Traded Stock ............................................................................ 7

           b.  Plaintiff's Interpretation of § 1955 Is Not Plausible ............................. 8

           c.  The Rule of Lenity Would Foreclose Plaintiff's Interpretation of § 1955 Even If It Was Plausible .......................................................... 9

           d.  Section 1955 Has No Extraterritorial Application .............................. 10

        2.  The Alleged Conduct Does Not Violate State Law ................................. 11

           a.  Plaintiff Has Not Alleged Any Violations of State Law ..................... 11

           b.  Plaintiff's Claims Regarding Violations of State Law Are Barred by the Dormant Commerce Clause ...................................................... 13

        3.  Even If Defendants' Alleged Activities Could Be Deemed to Have Violated Federal or State Law, They Would Not Constitute Negligence *Per Se* ...... 15

    B.  Plaintiff's Claims for Breach of Fiduciary Duty and Negligence Should Be Dismissed Because Plaintiff Failed to Allege Facts Sufficient to Rebut the Business Judgment Rule ................................................................................. 17

        1.  Plaintiff Has Not Alleged that Defendants Acted in "Bad Faith" ........... 19

        2.  The Complaint Does Not Plead Gross Negligence .................................. 21

C.   Plaintiff Cannot State a Claim for Breach of Fiduciary Duty Against the Investment Adviser Defendants.........................................................................................23

D.   The Complaint Fails to State a Claim for Waste ...........................................................24

CONCLUSION .........................................................................................................................26

## GLOSSARY OF DEFINED TERMS

| | |
|---|---|
| NBM | Defendant Neuberger Berman Management LLC |
| NB | Defendant Neuberger Berman, LLC |
| Investment Adviser Defendants | Defendants NB, NBM, Benjamin Segal, Milu E. Komer, Peter E. Sundman, and Jack L. Rivkin |
| Fund | Nominal defendant Neuberger Berman Equity Funds d/b/a Neuberger Berman International Fund |
| RICO | Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* |
| *Gamoran I* | *Gamoran v. Neuberger Berman Management LLC*, No. 08 Civ. 10807 (DLC) (S.D.N.Y.) |
| OCCA | Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 941 (1970) |
| Trust Agreement | Amended and Restated Trust Agreement, dated December 14, 2005 (Exhibit C to the Henkin Declaration) |
| Management Agreement | Management Agreement, dated November 3, 2003, between the Fund and NBM (Exhibit G to the Henkin Declaration) |
| Henkin Declaration or Henkin Decl. | Declaration of Douglas W. Henkin in Support of the Investment Adviser Defendants' Motion to Dismiss the Complaint, dated February 22, 2011 |
| SEC | United States Securities and Exchange Commission |
| 888 | 888 Holdings plc |
| NETeller | NETeller plc |

| | |
|---|---|
| Trustees | Defendants Peter E. Sundman, Jack L. Rivkin, John Cannon, Faith Colish, Martha C. Goss, C. Anne Harvey, Robert A. Kavesh, Howard A. Mileaf, Edward I. O'Brien, William E. Rulon, Cornelius T. Ryan, Tom D. Seip, Candace L. Straight, and Peter P. Trapp |
| LSE | London Stock Exchange |

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Alexander v. Sandoval,
532 U.S. 275 (2001)...................................................................................16

American Booksellers Found. v. Howard Dean,
342 F.3d 96 (2d Cir. 2003)........................................................................14

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009).............................................................5, 12, 21, 23

Basic Inc. v. Levinson,
485 U.S. 224 (1988)...................................................................................25

Broder v. Cablevision Sys. Corp.,
418 F.3d 187 (2d Cir. 2005)......................................................................16

Burns Jackson Miller Summit & Spitzer v. Lindner,
59 N.Y.2d 314 (N.Y. 1983) ......................................................................17

Cede & Co. v. Technicolor, Inc.,
734 A.2d 345 (Del. 1993) ..........................................................................17

Del. Elec. Coop. v. Duphily,
703 A.2d 1202 (Del. 1997) ........................................................................15

Elliott Assocs. v. Porsche Automobil Holding SE,
Nos. 10 Civ. 0532 & 10 Civ. 4155 (HJB), 2010 U.S. Dist. LEXIS 138399
(S.D.N.Y. Dec. 30, 2010)...........................................................................10

Hausman v. Buckley,
299 F.2d 696 (2d Cir. 1962).........................................................................6

Hirsch v. Arthur Andersen & Co.,
72 F.3d 1085 (2d Cir. 1995).........................................................................5

In re Am. Express Co. S'holder Litig.,
39 F.3d 395 (2d Cir. 1994)...........................................................................5

In re Bendectin Litig.,
857 F.2d 290 (6th Cir. 1988), cert. denied, 488 U.S. 1006 (1989)...........16

In re Citigroup Inc. S'holder Derivative Litig.,
964 A.2d 106 (Del. Ch. 2009)............................................................. passim

*In re Lear Corp. S'holder Litig.*,
    967 A.2d 640 (Del. Ch. 2008)...................................................................21, 24

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ........................................................................18, 19

*Jaghory v. N.Y. State Dep't of Educ.*,
    131 F.3d 326 (2d Cir. 1997).........................................................................5

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
    8 F.3d 130 (2d Cir. 1993).............................................................................9

*LAMPERS v. Blankfein*,
    No. 08 Civ 7605 (LBS), 2009 U.S. Dist. LEXIS 42852 (S.D.N.Y. May 19, 2009).........18, 19

*Lasavoy v. Lane*,
    304 F. Supp. 2d 520 (S.D.N.Y. 2004)...........................................................6

*Mark G. v. Sabol*,
    717 N.E.2d 1067 (N.Y. 1999).....................................................................15

*McBrearty v. Vanguard Grp., Inc.*,
    No. 08 Civ 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 353 F.
    App'x 640 (2d Cir. 2009), *cert. denied*, 130 S.Ct. 3411 (2010)...............................2

*Morrison v. Nat'l Austl. Bank*,
    130 S. Ct. 2869 (2010)..........................................................................10, 15

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
    No. 02 Civ. 0767 (LBS), 2004 U.S. Dist. LEXIS 24168 (S.D.N.Y. Dec. 2, 2004)..................6

*Nat'l Football League v. Governor of the State of Del.*,
    435 F. Supp. 1372 (D. Del. 1977)...............................................................17

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) .......................................................................23

*Nicholson v. S. Oaks Hosp.*,
    811 N.Y.S.2d 770 (N.Y. App. Div. 2006) ..................................................15

*People ex rel. Vacco v. World Interactive Gaming Corp.*,
    714 N.Y.S.2d 844 (N.Y. Sup. Ct. 1999) .........................................7, 8, 13, 20

*People v. Brown*,
    447 N.Y.S.2d 129 (N.Y. Crim. Ct. 1982) ..................................................12

*People v. Shing*,
    371 N.Y.S.2d 322 (N.Y. Crim. Ct. 1975) ..................................................12

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
    No. 08 Civ. 1958 (JGK), 2010 WL 3860397 (S.D.N.Y. Oct. 4, 2010) .............................10, 14

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ............................................................................................................4

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989)........................................................................................................6

*Sanabria v. United States*,
    437 U.S. 54 (1978)......................................................................................................................7

*Seidl v. American Century Cos.*,
    713 F. Supp. 2d 249 (2010), *appeal pending*, No. 10-2313
    (2d Cir., filed June 11, 2010) .....................................................................................................2

*Smith v. Hurd*,
    53 Mass. 371 (Mass. 1847) ........................................................................................................9

*Soft Classic S.A. de C.V. v. Hurowitz*,
    444 F. Supp. 2d 231 (S.D.N.Y. 2006)........................................................................................9

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990) ...........................................................................................................4

*Stackhouse v. Toyota Motor Co.*,
    No. CV 10-0922 (DSF), 2010 WL 3377409 (C.D. Cal. July 16, 2010) ...........................10, 14

*State ex rel. Nixon v. Interactive Gaming & Commc'ns Corp.*,
    No. CV-97-7808, 1997 WL 33545763 (Mo. Cir. Ct. May 23, 1997)........................................8

*State v. Daniel Panaro*,
    28 Del. 230 (Del. 1914) ............................................................................................................17

*United States v. Bass*,
    404 U.S. 336 (1971)..................................................................................................................10

*United States v. Bridges*,
    493 F.2d 918 (9th Cir. 1974) ......................................................................................................8

*United States v. Gotti*,
    459 F.3d 296 (2d Cir. 2006)........................................................................................................8

*United States v. Goyal*,
    No. 08-10436, 2010 U.S. App. LEXIS 25223 (9th Cir. Dec. 10, 2010)......................................9

*United States v. Granderson*,
    511 U.S. 39 (1994)....................................................................................................................10

*United States v. Murray,*
    928 F.2d 1242 (1st Cir. 1991) ........................................................................................9

*Walker v. City of N.Y.,*
    974 F.2d 293 (2d Cir. 1992) ..........................................................................................5

*White v. Panic,*
    783 A.2d 543 (Del. 2001) ............................................................................................24

*Wood v. Baum,*
    953 A.2d 136 (Del. 2008) ............................................................................................19

*Wright v. Moffitt,*
    437 A. 2d 554 (Del. 1981) ...........................................................................................15

*Zupnick v. Goizueta,*
    698 A.2d 384 (Del. Ch. 1997) .....................................................................................24

**RULES**

Fed. R. Civ. P. 8 ..................................................................................................................12

Fed. R. Civ. P. 12(b)(6) .....................................................................................................1, 5

**STATUTES AND CONSTITUTIONAL PROVISIONS**

11 Del. C. §§ 1401-1411 .....................................................................................................13

12 Del. C. § 3302 ...........................................................................................................22, 25

18 U.S.C. § 1955 ...................................................................................................................7

Del. Code Ann. tit. 8, § 159 ..................................................................................................9

Del. Constitution, Art. 2, § 17 .............................................................................................17

N.Y. Penal Law § 225.00 .....................................................................................................12

N.Y. Penal Law § 225.10 .....................................................................................................11

N.Y. Penal Law § 225.15 .....................................................................................................11

N.Y. Penal Law § 225.20 .....................................................................................................11

N.Y. Penal Law § 225.30 .....................................................................................................11

N.Y. Penal Law § 980 (1909) ..............................................................................................16

Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 (1970) ........................15

**OTHER AUTHORITIES**

H.R. Rep. 91-1549 (1970)...............................................................................................8

Paul G. Haskell, *The Prudent Person Rule For Trustee Investments and Modern Portfolio Theory*, 69 N.C. L. Rev. 87 (1990) ...............................................................................21

Pursuant to Fed. R. Civ. P. 12(b)(6), the Investment Adviser Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

Plaintiff alleges that the Fund violated federal and state anti-gambling law by investing in two publicly traded non-U.S. companies (888 and NETeller, both of which were listed and traded on the LSE, not any U.S. markets). Plaintiff's claims fail as a matter of law for several distinct reasons, the core being that the statutes Plaintiff relies on do not criminalize ownership of publicly-traded stock. And to the extent Plaintiff argues that the Fund's investments in 888 and NETeller were unduly risky, he fails to allege any facts to support such a theory. Essentially, Plaintiff asks this Court to hold Defendants liable because, in hindsight, two of the Fund's many investment decisions turned out poorly. This Court and others have considered and soundly rejected such claims, and the result should be the same here. And because Plaintiff has had numerous opportunities to plead the claims in the Complaint (in this case and other related cases), the Complaint should be dismissed with prejudice.

## BACKGROUND AND RELATED ACTIONS

Plaintiff filed this action on July 15, 2010 in the Supreme Court of the State of New York. Defendants removed the action to this Court on August 19, 2010. Plaintiff moved to remand the action on September 1, 2010. On November 8, 2010, the Court denied Plaintiff's remand.[1]

The claims in the Complaint were originally asserted in *Gamoran I*. That case was part of a group of cases purporting to assert class and derivative claims alleging that

---

[1] *See* Docket No. 14. Plaintiff subsequently moved for reconsideration and reargument pursuant to Fed. R. Civ. P. 54(b) and Local Rule 6.3. The Court denied that motion on February 9, 2011. *See* Docket No. 21.

investments by certain mutual funds in publicly traded stock of certain non-U.S. companies were "illegal."[2]  The Complaint omits the RICO claims that were asserted in *Gamoran I* and only purports to plead derivative claims.

## STATEMENT OF FACTS

### A.    The Parties

Plaintiff Benjamin M. Gamoran purports to sue the Defendants derivatively on behalf of the Fund, alleging that he purchased shares in the Fund in 2000.[3]

The Fund is an open-end investment company, more commonly known as a mutual fund, registered with the SEC.  The Fund is a series of Neuberger Berman Equity Funds, a statutory trust organized under Delaware law.[4]  NBM serves as the Fund's investment adviser and is responsible for managing the Fund's investment portfolios and providing administrative services to the Fund.[5]  NB serves as the Fund's sub-adviser.[6]  Although Plaintiff does not discuss the Fund's overall performance during the period at issue, that publicly available fact is highly relevant to this case.  During the period in which the Fund held 888 and NETeller stock, the Fund's share price *increased* 23.2%.[7]

---

[2]  *See McBrearty v. Vanguard Grp., Inc.*, No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*, 353 F. App'x 640 (2d Cir. 2009), *cert. denied*, 130 S.Ct. 3411 (2010); *Seidl v. American Century Cos.*, 713 F. Supp. 2d 249 (2010), *appeal pending*, No. 10-2313 (2d Cir., filed June 11, 2010).  The action against Vanguard was re-filed by different plaintiffs (but the same counsel) in Delaware Chancery Court (*Hartsel v. Vanguard Grp., Inc.*, No. CA-5394 (Del. Ch.)).  And in *Seidl*, the plaintiff has asked the Second Circuit to vacate as moot the judgment dismissing the derivative claims because the plaintiff subsequently made a demand on the board and commenced a new action alleging that demand had been refused.  *See* Henkin Decl. Exh. A at 29-30.

[3]  Compl. ¶¶ 2, 7.

[4]  Compl. ¶¶ 9-10.

[5]  Compl. ¶ 12.

[6]  Compl. ¶ 13.

[7]  *See* (Henkin Decl. Exh. B).

Defendants Segal and Komer served as portfolio managers of the Fund.[8]
Defendants Sundman and Rivkin, in addition to holding various positions within NBM and/or
NB, served as interested trustees of the Fund during the period relevant to this action.[9]

### B.    Plaintiff's Claims

The gravamen of the Complaint is that Defendants caused the Fund to "illegally"
invest in two publicly traded non-U.S. companies, one of which ultimately became the target of
federal government enforcement action.  Specifically, Plaintiff alleges that "Defendants violated,
and caused [the Fund] to violate various federal and state criminal statutes," specifically 18
U.S.C. § 1955 and N.Y. Penal Law Article 225, when they caused the Fund to invest in 888 and
NETeller stock.[10]

Plaintiff alleges that the nature of 888 and NETeller's business operations was
disclosed to the public through, among other things, public filings by 888 and NETeller
themselves, news media reports, and government sources.[11]  Plaintiff contends that Defendants
knew or were reckless in not knowing that 888 and NETeller were taking bets from gamblers in
the U.S. or processing payments relating to such bets.[12]  Plaintiff contends that the share prices
of 888 and NETeller fell dramatically after July 2006 (when increased law enforcement began

---

[8]    Compl. ¶¶ 15-16.

[9]    Compl. ¶¶ 17-18.

[10]   Compl. ¶ 41.  Plaintiff does not allege that 888 or NETeller was a target of U.S.
enforcement action before the Fund bought stock in either company on the LSE.  Plaintiff
alleges that 888 halted its U.S. operations after the Fund purchased 888 stock (Compl. ¶¶
42-44, 87) but does not allege that 888 was a target of U.S. enforcement action.  And
although Plaintiff asserts that NETeller became a target of U.S. enforcement action, he
concedes that was *after* the Fund sold its NETeller stock (Compl. ¶¶ 35-36, 50).

[11]   Compl. ¶¶ 28-30, 34-37.

[12]   Compl. ¶ 57.

against gambling companies generally) and, as a result, the Fund was injured.[13]  The Complaint cites media reports, press releases, and proceedings relating to enforcement actions taken by the U.S. Department of Justice and certain states against gambling businesses and their officers, but never against investors in publicly traded stock or investment advisors.[14]

Asserting that the Fund's investments in 888 and NETeller were themselves illegal — that is, simply buying and owning securities lawfully listed and traded on the LSE was illegal — Plaintiff purports to bring common law claims for breach of fiduciary duty, negligence, and waste derivatively on behalf of the Fund.[15]

### C.    Plaintiff's Allegations and About-Face Concerning Demand

Like the complaint in *Gamoran I* (and other cases filed by Plaintiff's counsel), the Complaint alleged that Plaintiff was not required to make demand on the Fund's board before pursuing the claims asserted in the Complaint.[16]  But just days before this motion was due to be filed, Plaintiff suddenly changed course and demanded that the Fund's board pursue the claims in the Complaint.[17]  The effect of that about-face is twofold:  *First*, making demand is a legally binding concession that demand was not excused,[18] and it is thus a concession that Plaintiff's assertions regarding demand have always been baseless.[19]  *Second*, it eliminates any need for the

---

[13]    Compl. ¶¶ 85, 89.

[14]    Compl. ¶¶ 35-36, 57-84.

[15]    Compl. ¶¶ 128, 133, 139.

[16]    *See* Compl. ¶¶ 93-125; Henkin Decl. Exh. I ¶¶ 54-66.

[17]    *See* Henkin Decl. ¶¶ 9-10 & Exh. H.

[18]    *See Rales v. Blasband*, 634 A.2d 927, 935 n.12 (Del. 1993); *Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del. 1990).  The paragraph of Plaintiff's demand letter purporting to not concede the board's independence is thus a nullity.

[19]    The letter is a concession that Plaintiff never should have alleged demand futility, or at least should not have continued those allegations from *Gamoran I* to this litigation.  The Investment Advisor Defendants have spent considerable resources preparing to address

Court to consider demand issues before deciding whether the Complaint states a claim upon which relief could be granted.

## ARGUMENT

### I.   STANDARD OF REVIEW

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts take as true a complaint's well-pled factual allegations,[20] but conclusory allegations or legal conclusions masquerading as factual allegations are ignored and courts are not required to draw unreasonable inferences in a plaintiff's favor.[21]   To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[22] Thus, courts evaluating the sufficiency of a complaint must determine whether non-conclusory allegations, accepted as true, "plausibly give rise to an entitlement to relief."[23]   A complaint that offers labels and conclusions or "naked assertions" devoid of factual enhancement is insufficient, and where the well-pled facts do not permit the court to infer more than the mere possibility of misconduct, the complaint does not show that the pleader is entitled to relief.[24]

---

Plaintiff's demand futility allegations, resources they should never have had to expend. Moreover, the timing of Plaintiff's about-face is at best suspicious.

[20]   *See Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997); *Walker v. City of N.Y.*, 974 F.2d 293, 298 (2d Cir. 1992).

[21]   *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995); *see also In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 n.3 (2d Cir. 1994) ("conclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss").

[22]   *Iqbal*, 129 S. Ct. at 1949-50 (internal quotes omitted).

[23]   *Id.* at 1950.

[24]   *Id.*

## II.   CHOICE OF LAW

New York's choice of law rules govern here.[25]  Those rules honor the choice of law clauses in documents governing or related to a dispute so long as "the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance [and] so long as the fundamental policies of New York are not thereby violated."[26]  New York also applies the "internal affairs" rule, which requires the Court to apply the law of the state of incorporation to corporate governance issues.[27]  At all times relevant to this litigation, the Fund was governed by the Trust Agreement, which adopts Delaware law.[28]  Because Plaintiff's claims all relate to the governance and administration of the Fund, Delaware law governs.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM

### A.   The Complaint Fails to Plead that Defendants Violated Any Law

Plaintiff asserts that Defendants and the Fund violated "various federal and state criminal statutes" by "causing Nominal Defendant to purchase, through the Fund, stock in illegal gambling businesses ... ."[29]  Because the Complaint does not specify which state or federal statutes were supposedly violated beyond its references to § 1955 and Article 225, this motion addresses the statutes cited in the Complaint and Plaintiff's motion for reconsideration of the Court's denial of remand.[30]  As shown below, the Complaint does not plead violations of any statute Plaintiff has cited.  And even if it did, that would not suffice to plead negligence *per se*.

---

[25]   *See Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2004 U.S. Dist. LEXIS 24168, at *34-35 (S.D.N.Y. Dec. 2, 2004); *see also Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989).

[26]   *See Lasavoy v. Lane*, 304 F. Supp.2d 520, 538 (S.D.N.Y. 2004).

[27]   *See Hausman v. Buckley*, 299 F.2d 696, 702 (2d Cir. 1962).

[28]   Trust Agreement Art. X, § 7 (Henkin Decl. Exh. C).

[29]   Compl. ¶ 41.

[30]   Compl. ¶¶ 27, 35, 36, 37, 62; Pl.'s Br. in Supp. of Mot. for Recons. at 4.

1.     The Fund's Investments Did Not Violate § 1955

Plaintiff alleges that Defendants violated § 1955 by purchasing and owning

publicly traded stock in alleged "illegal gambling business[es]" listed on the LSE.[31]  Although

Plaintiff sprinkles the phrase "illegal gambling business" liberally throughout the Complaint, he

concedes that no court has ever interpreted § 1955 to apply to the purchase or ownership of

publicly traded shares of a company lawfully listed and traded on a non-U.S. stock exchange (or

even on a U.S. exchange, for that matter).[32]  There is no legal support for Plaintiff's arguments

that buying or owning publicly traded stock violates § 1955.

> a.     *No Authority Has Interpreted § 1955 to*
>        *Apply to Owners of Publicly Traded Stock*

No court has held that the purchase or ownership of publicly traded stock can

itself be a violation of § 1955.  Nor is there any indication that any prosecutor or regulator has

pursued charges against a purchaser or owner of publicly traded shares for violating § 1955.

Nothing in the text of § 1955, its legislative history, or the case law discussing it supports

Plaintiff's theory.

Section 1955 makes it a crime to "conduct[], finance[], manage[], supervise[],

---

[31]    *See* Compl. ¶¶ 24, 33, 41.  Beyond the fact that Plaintiff does not properly allege that any
conduct by any Defendant violated § 1955, he does not even allege that 888 or NETeller
violated § 1955 because he does not adequately allege that either company violated any
specific state or local law, as required by 18 U.S.C. § 1955(b)(1)(i).  And the only
activity Plaintiff claims occurred inside the U.S. was betting, which does not trigger §
1955 (*Sanabria v. United States*, 437 U.S. 54, 70 & n.26 (1978)) and in any event is not
alleged to have been undertaken by any Defendants.

[32]    *See* Tr. of Oral Argument on Mot. to Remand at 4, 6 (Nov. 3, 2010) (Henkin Decl. Exh.
D); Pl.'s Br. in Supp. of Mot. to Remand at 9.  *People ex rel. Vacco v. World Interactive
Gaming Corp.*, 714 N.Y.S.2d 844, 861 (N.Y. Sup. Ct. 1999), does not support Plaintiff's
position:  In that case, the court only considered whether an online casino that was based
overseas but was operated and managed in New York and tried to sell unregistered
investments to New York residents from New York itself violated laws other than §
1955.  And there were no claims in that case that *investors* violated any laws.

direct[], or own[] all or part of an illegal gambling business" (with "illegal gambling business" being separately defined in the statute).  Plaintiff focuses on the fact that the statute includes the word "own," but that is not dispositive.  That word must be considered in the context of the rest of the statutory text, and the first five activities prohibited by the statute are inconsistent with liability for mere ownership of publicly traded stock.  Thus, all of the cases Plaintiff has referenced about the interpretation of § 1955 have dealt with conduct falling within the first five prohibited categories, and none support his interpretation of § 1955.[33]

> b.    *Plaintiff's Interpretation of § 1955 Is Not Plausible*

As an initial matter, § 1955 should be read narrowly,[34] and both § 1955's history and the background law regarding corporations strongly suggest that Congress did not intend Plaintiff's interpretation.  In enacting § 1955, Congress stated that the statute was intended to reach "only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern" and are "of considerably greater magnitude than simply meet[ing] the minimum definitions."[35]  Consistent with those statements, the first five types of conduct prohibited by § 1955 are characteristic of active involvement in an enterprise, not passive ownership of stock purchased on a public, non-U.S. market, and nothing in the statute or legislative history suggests that "owns" should have broader interpretation.

Indeed, Plaintiff's interpretation of § 1955 would potentially impose criminal liability on any investor who purchased even one share in a company that had any involvement

---

[33]  *See United States v. Gotti*, 459 F.3d 296, 340-41 (2d Cir. 2006); *State ex rel. Nixon v. Interactive Gaming & Commc'ns Corp.*, No. CV-97-7808, 1997 WL 33545763 (Mo. Cir. Ct. May 23, 1997).  *World Interactive Gaming* did not address § 1955 at all.

[34]  *See United States v. Bridges*, 493 F.2d 918, 922 (9th Cir. 1974).

[35]  H.R. Rep. 91-1549, at 4029 (1970).

with an "illegal gambling business." This is inconsistent with well-established legal principles that purposely create a divide between corporate entities and their shareholders. Courts have consistently held that one of the primary purposes of a corporation is to insulate shareholders from legal liability,[36] and state law is clear that owning stock in a company is not the same as owning the company or its assets.[37] Congress knew that when it enacted § 1955, and there is nothing to suggest that it intended § 1955 to override that longstanding principle.

c.   *The Rule of Lenity Would Foreclose Plaintiff's Interpretation of §*
*1955 Even If It Was Plausible*

The rule of lenity requires ambiguities in a criminal statute to be resolved in a defendant's favor so long as such an interpretation does not run counter to Congress's intent in enacting the statute.[38] Plaintiff alleges that the Fund violated § 1955's prohibition on "owning all or part of" an illegal gambling operation.[39] The question is whether owning publicly traded shares in lawfully listed and traded corporations is what Congress intended to prohibit in § 1955. As shown above, the term "own all or part of" is at the very least ambiguous with regard to open market purchases and ownership of publicly traded stock in lawfully listed corporations. Thus, the rule of lenity would preclude Plaintiff's interpretation of § 1955 even if it were plausible

---

[36]   *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 240 (S.D.N.Y. 2006).

[37]   *See generally* Del. Code Ann. tit. 8, § 159 ("The shares of stock in every corporation shall be deemed personal property … ."); *Smith v. Hurd*, 53 Mass. 371, 385 (Mass. 1847) (shareholders are not legal owners of corporate property).

[38]   *See generally United States v. Murray*, 928 F.2d 1242, 1246 (1st Cir. 1991) ("Furthermore, to avoid the imposition of penalties not intended by Congress, the courts have applied the doctrine of lenity when there is serious doubt as to the reach of a criminal statute. The doctrine of lenity 'rests on the fear that expansive judicial interpretations will create penalties not originally intended by the legislature.'") (internal citations omitted); *accord United States v. Goyal*, No. 08-10436, 2010 U.S. App. LEXIS 25223, at *28 (9th Cir. Dec. 10, 2010) (Kozinski, C.J., concurring) ("criminal law should clearly separate conduct that is criminal from conduct that is legal").

[39]   Compl. ¶ 41.

(which it is not).[40]

           d.     *Section 1955 Has No Extraterritorial Application*

       The Supreme Court recently reiterated that "[w]hen a statute gives no clear

indication of an extraterritorial application, it has none" and that the presumption against

extraterritoriality applies in *all* cases.[41]  Following *Morrison*, courts have expressly rejected the

theory that a purchase by a U.S. investor of stock of a non-U.S. company on a non-U.S. market

"occurs" in the U.S. for extraterritoriality purposes.[42]  In particular, neither the fact that an

investor might have decided to purchase stock in the U.S. nor the location of the alleged harm

can overcome the presumption that federal statutes do not apply extraterritorially.[43]

       888 and NETeller were listed and traded on the LSE, and Plaintiff does not

dispute that the Fund's purchases of those stocks were made on the LSE.  And § 1955 contains

no indication that Congress intended it to apply extraterritorially.  Instead, § 1955 applies solely

to conduct occurring in the United States, which is not the case here.[44]  Indeed, Plaintiff

---

[40]    *See United States v. Granderson,* 511 U.S. 39, 40 (1994) ("where the text, structure, and statutory history fail to establish that the [plaintiff's] position is unambiguously correct, the rule of lenity operates to resolve the statutory ambiguity in [the defendant's] favor"); *United States v. Bass*, 404 U.S. 336, 348 (1971) ("Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant."); *see also* III Sutherland Statutory Construction § 59:4 (7th ed.).

[41]    *See Morrison v. Nat'l Austl. Bank*, 130 S. Ct. 2869, 2873, 2878 (2010).

[42]    *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, No. 08 Civ. 1958 (JGK), 2010 WL 3860397, at *18 (S.D.N.Y. Oct. 4, 2010); *Stackhouse v. Toyota Motor Co.*, No. CV 10-0922 (DSF), 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010).

[43]    *See Swiss Reins.*, 2010 WL 3860397, at *9; *see also Elliott Assocs. v. Porsche Automobil Holding SE*, Nos. 10 Civ. 0532 & 10 Civ. 4155 (HJB), 2010 U.S. Dist. LEXIS 138399, at *18-19 (S.D.N.Y. Dec. 30, 2010) ("Several courts in this district have already rejected the notion that 'domestic transactions in other securities' include an investor's placement of a buy order in the United States for a security traded abroad.").

[44]    That some internet gaming companies were themselves subject to charges under § 1955 in connection with *their* participation in gaming transactions with U.S. residents has nothing to do with whether § 1955 could reasonably be read to apply to international

concedes that U.S. anti-gambling laws have no extraterritorial reach by affirmatively pleading that 888 and NETeller chose not to list their stock in the U.S. "to evade the reach of the U.S. criminal justice system ... ."[45] Thus, § 1955 could not apply to the Fund's purchase or ownership of 888 and NETeller.[46]

2.      The Alleged Conduct Does Not Violate State Law

a.      *Plaintiff Has Not Alleged Any Violations of State Law*

Article 225.  Plaintiff attempts to plead normal investment behavior — purchasing and owning stock, voting at shareholder meetings, and receiving dividends and capital gains (if any) — as the basis for criminal liability under Article 225.  But the only provision of Article 225 that is arguably applicable here is § 225.05, which criminalizes "knowingly advanc[ing] or profit[ing] from unlawful gambling activity."[47]  "[A]dvance[ing] gambling activity" is defined as "conduct that materially aids any form of gambling activity" and "profit[ing] from gambling activity" means "when, other than as a player, [defendant] accepts or

---

securities transactions such as those at issue here.  The prohibited conduct with respect to such companies is at most their interaction with U.S. residents in connection with actual gaming transactions, not secondary market LSE stock transactions involving entirely different parties (and in which 888 and NETeller were not even involved).

[45]   Compl. ¶ 38.

[46]   *Accord Porsche*, 2010 U.S. Dist. LEXIS 138399, at *24 (noting that the '34 Act was not intended to regulate foreign securities exchanges and *Morrison*'s "strong pronouncement that U.S. courts ought not interfere with foreign securities regulation without a clear Congressional mandate").  The same reasoning applies here — U.S. courts should not interfere with foreign corporate or securities regulation without a clear legislative mandate.

[47]   The other provisions of Article 225 cannot be at issue because Plaintiff does not allege that Defendants directly participated in operating any gambling enterprise.  *See* N.Y. Penal Law § 225.10 (prohibiting "bookmaking," lotteries, and "numbers games"); N.Y. Penal Law § 225.15 (possession of gambling records); N.Y. Penal Law § 225.20 (possession of gambling records); N.Y. Penal Law § 225.30 (possession of a gambling device).  Plaintiff does not allege that someone does any of the things prohibited by these statutes by buying or owning publicly traded stock (which would be inconsistent with the general principle that shareholders do not own a corporation's assets).

receives money or other property pursuant to an agreement or understanding with any person whereby [defendant] participates or is to participate in the proceeds of gambling activity."[48]  But Plaintiff does not allege that the Fund did either.  Instead, Plaintiff alleges that the Fund "attended and voted by proxy at the annual meeting[s]" of 888 and NETeller and voted to elect and compensate the companies' directors and executives.[49]  These are ordinary incidents to owning publicly traded stock and cannot qualify as "considerably" or to a "great extent" aiding gambling activity.  They thus do not qualify as "materially aiding" a gambling company.[50]  Similarly, Plaintiff does not allege that the Fund profited from its investments in 888 and NETeller; rather, Plaintiff alleges that the Fund *lost* money on these investments.[51]

The inapplicability of Article 225 can also be seen by looking at the specific behaviors prohibited under § 225.05, including possessing gambling equipment, soliciting persons to gamble, conducting gambling games, and allowing a building to be used for gambling.[52]  Although the list set forth in the statute is non-exclusive, these examples clearly show that its intended scope is the *operation* of a gambling business.  And that is how New York courts have applied § 225.05 — to defendants who operated gambling businesses.[53]  But no court has applied § 225.05 to someone who bought or owned publicly traded stock.  Indeed, in the only instance Plaintiff cites in which Article 225 has been applied to an online casino company, the

---

[48]   N.Y. Penal Law § 225.00.  "Materially" means "to a great extent; substantially; considerably."  *See People v. Shing*, 371 N.Y.S.2d 322, 326 (N.Y. Crim. Ct. 1975).

[49]   Compl. ¶¶ 52-54.

[50]   *See Shing*, 371 N.Y.S.2d at 326.  Because all Plaintiff has done is plead ordinary investor activity as opposed to actions that could plausibly be viewed as improper, the Complaint does not satisfy the requirements of Fed. R. Civ. P. 8.  *See Iqbal*, 129 S. Ct. at 1950.

[51]   Compl., page 27 ("Prayer for Relief").

[52]   N.Y. Penal Law § 225.00.

[53]   *See Shing*, 371 N.Y.S.2d at 326-27; *People v. Brown*, 447 N.Y.S.2d 129, 473 (N.Y. Crim. Ct. 1982).

New York Attorney General's Office chose not to prosecute owners of stock in the gaming

company, but instead considered them "injured investors" and sought "restitution and damages"

on their behalf.[54] And as with § 1955, as demonstrated above the rule of lenity would preclude

Plaintiff's interpretation of Article 225 even if that interpretation were plausible.

                    <u>Delaware Law</u>.  Although it is not discussed in the Complaint, in his motion for

reconsideration or reargument Plaintiff asserted that the Fund's investments in 888 and NETeller

violated 11 Del. C. §§ 1401-1411.[55]  But these statutes deal with lotteries or numbers games (§§

1401-1402), betting on racing, boxing competitions, and the like (§ 1403), providing premises

for gambling or possessing gambling devices (§§ 1404-1406), engaging in a crap game (§ 1407),

and disseminating gambling information (§ 1411).[56]  In each case, the statute makes clear that it

only applies to those who actually participate in the gambling activity rather than passive

shareholders.[57]  Thus, Plaintiff also has not stated claims that Defendants violated Delaware law.

                b.     *Plaintiff's Claims Regarding Violations of State*
                     *Law Are Barred by the Dormant Commerce Clause*

                    Even if Plaintiff's argument that any state criminal laws could be read to prohibit

the purchase and ownership of publicly traded stock made textual sense, the application of such

laws to transactions occurring outside the U.S. would violate the dormant Commerce Clause.[58]

---

[54]    *See World Interactive Gaming*, 714 N.Y.S.2d at 848.

[55]    To make clear that Plaintiff has stated no claim at all, the Defendants will also address
these statutes.

[56]    Sections 1408 (exempting lotteries intended to spur interest in merchandise), 1409
(exempting police officers acting in the course of duty), and 1410 (blank) are clearly
inapplicable.

[57]    *E.g.,* 11 Del. C. § 1404 ("A person is guilty of providing premises for gambling when
…").

[58]    This analysis would apply to any state's law Plaintiff might assert in opposing this
motion, whether or not Plaintiff has previously asserted reliance on that state's law.

A state statute violates the dormant Commerce Clause if it has the practical effect of exerting control of commerce occurring entirely outside the boundaries of the state in question.[59] The conduct complained of in the Complaint is the Fund's investments in 888 and NETeller, which were not domestic transactions.

That Plaintiff's theory of liability conflicts with the dormant Commerce Clause can best be understood by assuming that state law could apply as Plaintiff suggests and noting the absurd results that would follow:

- First, contrary to the above demonstration that state anti-gambling law (such as Article 225) cannot be read to apply to the purchase and ownership of publicly traded stock, assume that such application was a plausible statutory construction not barred by the rule of lenity.

- Next, assume that at precisely the same moment in time, an investor in New York and an investor in Paris each directed their brokers to purchase one share of NETeller or 888 stock on the LSE. Because both transactions took place on the LSE,[60] both investors have done the same thing, at the same time, in the same place. So which investor violated Article 225 — both investors, only the Parisian investor, or only the New York investor?

- Because both transactions took place on the LSE (and outside any U.S. state), there is no analytically consistent basis to avoid finding that the Paris investor violated Article 225 if the New York investor did so. Indeed, assume there was such a basis, but that the Parisian investor then traveled or moved to New York while he or she still owned the single NETeller or 888 share purchased on the LSE. Would the Parisian investor then be guilty of violating Article 225 because he or she owned that stock while in New York? Answering yes is absurd,[61] but answering no means

---

[59]  *See generally American Booksellers Found. v. Howard Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (Vermont law regulating internet communications containing sexually explicit materials violated the dormant Commerce Clause).

[60]  *See Swiss Reins. Co.*, 2010 WL 3860397, at *9; *Stackhouse*, 2010 WL 3377409, at *1.

[61]  Allowing such an application of state law would frustrate world markets and international travel (thus also raising significant foreign policy power issues): Anyone owning stock, even stock purchased on a non-U.S. exchange like the LSE, would have to carefully study the laws of all fifty states before setting foot on U.S. soil to avoid interpretations like the one Plaintiff advances. Similarly, any U.S. citizen who owned stock would need to investigate whether stock they owned would violate the laws of any state they traveled to, even if such a purchase was legal in their home state and the jurisdiction that was

there was no basis to distinguish between the New York and Parisian investors in the first instance.[62]

Because every analytically consistent interpretation of state law that would cover the Fund's investments in 888 and NETeller necessarily implies state regulation of purely foreign conduct, the dormant Commerce Clause precludes those interpretations and thus precludes the application of state law to the Fund's investments in 888 and NETeller.

        3.        Even If Defendants' Alleged Activities Could Be
                    Deemed to Have Violated Federal or State Law,
                    They Would Not Constitute Negligence *Per Se*

Negligence *per se* requires that a plaintiff asserting the negligence claim be a part of the class of persons that the statute he or she claims was violated was intended to protect.[63] And because negligence *per se* effectively creates a private right of action for violation of a statute, the creation of such a right must be consistent with the legislative scheme in which the statute was enacted.[64] Because neither is true here, there can be no negligence *per se* claim.

Section 1955. Congress enacted § 1955 as part of the OCCA, which also enacted the RICO statute. The OCCA's preface indicates that Congress intended the OCCA to halt the influence of organized crime, which threatened to "infiltrate and corrupt legitimate business and labor unions."[65] But Plaintiff does not allege any conduct like that at which Congress aimed the OCCA — he alleges the purchase and ownership of stock that the LSE deemed appropriate for

---

home to the exchange the purchase was made on. This is what limitations on state power like the dormant Commerce Clause are designed to avoid.

[62] This is precisely the sort of unpredictability and inconsistency that the Supreme Court sought to avoid by rejecting the conduct and effects tests in *Morrison*. *See* 130 S. Ct. at 2883.

[63] *Del. Elec. Coop. v. Duphily*, 703 A.2d 1202, 1209 (Del. 1997); *Nicholson v. S. Oaks Hosp.*, 811 N.Y.S.2d 770, 771 (N.Y. App. Div. 2006).

[64] *See Wright v. Moffitt*, 437 A. 2d 554, 559 (Del. 1981); *Mark G. v. Sabol*, 717 N.E.2d 1067, 1070 (N.Y. 1999).

[65] OCCA at 923.

listing and trading on that market, something Congress has no say in.  Nor would allowing

Plaintiff to proceed on a negligence *per se* theory based on § 1955 be consistent with the

legislative scheme Congress enacted:

- Congress enacted § 1955 against the backdrop of general corporate law, in which shareholders are not held liable for acts of the corporation except in unusual situations not present (or even alleged) here.  If Congress had meant to change the ordinary rule that shareholders are not liable for the activities of the companies in which they invest, it would have said so specifically.

- Congress did not provide a private right of action for violations of federal criminal law in general, or § 1955 in particular.[66]  And allowing for a private right of action through the back door of state law would itself be inconsistent with Congress's intent in enacting § 1955.[67]

        <u>Article 225</u>.  Prior to 1967 (when the New York Legislature reformed New

York's anti-gambling statutes), several New York statutes provided for civil remedies relating to

gambling enterprises.  Under the previous statutory regime, for example, persuading a person to

visit a gambling establishment gave rise to a civil claim for that person's gambling losses.[68]  The

1967 enactment eliminated those remedies.  The New York Legislature clearly understood how

---

[66]    Congress did not create a private right of action for violating § 1955 except through the RICO statute.  The Second Circuit has held that there are no RICO claims in a case like this, *see supra* note 2, which Plaintiff tries to get around by seeking a private right of action under the guise of state law.  But only Congress can create a private right of action to enforce federal law, *see Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and it has not done so here.

[67]    *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) ("Were we to hold, despite *Conboy*, that GBL § 349 may be used to assert a private right of action for violation of a federal law otherwise lacking one, we would essentially be attributing to the New York legislature an intent to thwart Congress's intentions on a significant scale."); *accord In re Bendectin Litig.*, 857 F.2d 290, 313-14 (6th Cir. 1988) ("A state's ability to use a federal statute violation as a basis for state tort liability and negligence per se depends on the intent of Congress, and not merely on the intent of the state."), *cert. denied*, 488 U.S. 1006 (1989).  What Plaintiff seeks here is actually more extreme than the situation *Broder* presented, because Plaintiff seeks to use common law, non-statutory causes of action to pursue claims under federal and state statutes that provide no private rights of action, precisely what the Sixth Circuit warned against in *Bendectin*.

[68]    N.Y. Penal Law § 980 (1909) (Henkin Decl. Exh. E).

to create civil claims for violations of criminal anti-gambling statutes, but chose to eliminate such claims when it created the Article 225 regime.  Where, as here, the New York legislature has repealed an explicit private right of action, no private right of action remains.[69]

   <u>Delaware Law</u>.  Delaware's anti-gambling statutes and constitutional provision were enacted to protect Delaware citizens from the influence of gambling.[70]  The Delaware legislature did not intend for these provisions to protect businesses or investors.[71]  Because the Fund is not part of the class of persons intended to be protected by the Delaware anti-gambling statutes and constitutional provision, Plaintiff cannot rely on negligence *per se* here.

### B. Plaintiff's Claims for Breach of Fiduciary Duty and Negligence Should Be Dismissed Because Plaintiff Failed to Allege Facts Sufficient to Rebut the Business Judgment Rule

   Under Delaware law, the business judgment rule applies to decisions by corporate officers and directors.[72]  Decisions will not be disturbed by courts unless the directors or officers were interested or lacked independence relative to the decision, did not act in good faith, acted in a manner that cannot be attributed to a rational business purpose, or reached their decision by a grossly negligent process that includes the failure to consider all material facts reasonably

---

[69] *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 329-30 (N.Y. 1983).

[70] *See State v. Daniel Panaro*, 28 Del. 230 (Del. 1914) (predecessor statute to 11 Del. C. § 1406 was enacted to protect the "morals of the community"); *Nat'l Football League v. Governor of the State of Del.*, 435 F. Supp. 1372, 1383 (D. Del. 1977) (Art. 2, § 17 of the Delaware Constitution was enacted "based on some generalized belief that gambling was a corrupting, dangerous influence in society from which the people of [Delaware] should be protected").

[71] In *National Football League*, the court rejected arguments that federal anti-gambling statutes were enacted to benefit "sports entrepreneurs," holding that such statutes were meant to protect citizens "from the demoralizing or corrupting influence of solicitations to gamble."  435 F. Supp. at 1388.  A Delaware court would likely reject arguments that Delaware's anti-gambling statutes and constitutional provision were enacted to protect mutual fund investors based on similar reasoning.

[72] *See Cede & Co. v. Technicolor, Inc.*, 734 A.2d 345, 361 (Del. 1993).

available.[73]  A plaintiff who fails to rebut the presumptions of the business judgment rule is not entitled to any remedy unless the transaction constituted waste.[74]  Plaintiff attempts to evade the business judgment rule by arguing that: (1) 888 and NETeller operated illegal gambling operations and there was a known risk that federal authorities could crack down on these operations; (2) Defendants knew these risks but recklessly proceeded to invest in these corporations; and (3) if Defendants were ignorant of these risks, it was because they breached their duties to conduct due diligence and monitor the investment process.

Courts have rejected exactly this type of argument.[75]  In *Citigroup*, the plaintiffs alleged that the directors of Citigroup failed to monitor and manage the risks that Citigroup faced from problems in the subprime lending market.[76]  Instead of specifically alleging how the directors had failed to monitor Citigroup's risks, the plaintiffs argued that certain "red flags" should have given the defendants notice of the impending problems in the subprime mortgage market and that the defendants either (1) consciously ignored these risks in the reckless pursuit of profits or (2) were ignorant of these risks because they failed to properly implement a system to identify risk.[77]  The Chancery Court rejected that argument, holding that the plaintiffs' conclusory allegations failed to adequately explain what the directors did or did not do to violate their duties to Citigroup.[78]  The court further recognized that the plaintiffs' theory was an attempt to evade the business judgment rule, reiterating that "the mere fact that a company takes on

---

[73]  *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 n.62 (Del. 2006).

[74]  *See id.* at 73-74.

[75]  *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009); *see also LAMPERS v. Blankfein*, No. 08 Civ. 7605 (LBS), 2009 U.S. Dist. LEXIS 42852 (S.D.N.Y. May 19, 2009) (rejecting similar argument).

[76]  *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d at 111.

[77]  *Id.* at 126-27.

[78]  *Id.* at 129.

business risk and suffers losses — even catastrophic losses — does not evidence misconduct and, without more, is not a basis for personal director liability."[79]

Plaintiff does not allege that any Defendants had interests in the Fund's 888 or NETeller investments or that any Defendants lacked independence relative to those investments. Instead, Plaintiff appears to argue that Defendants did not act in good faith or could not reasonably have chosen to invest in 888 or NETeller.  Both arguments fail.

1.    *Plaintiff Has Not Alleged that Defendants Acted in "Bad Faith"*

A fiduciary acts in bad faith when (1) he or she intentionally acts with a purpose other than that of advancing the best interests of the corporation, (2) he or she acts with the intent to violate applicable positive law, or (3) he or she intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his or her duties.[80]  Plaintiff has not asserted the first type of bad faith, because Plaintiff does not — and cannot — allege that the Defendants purchased stock in 888 or NETeller for any reason other than as part of the Fund's general investment strategy.

Plaintiff also fails to adequately plead that Defendants knew that investing in 888 or NETeller violated any law.  In order to plead bad faith in this way, a plaintiff must plead "facts that demonstrate that [Defendants] … had 'actual or constructive knowledge' that *their conduct* was legally improper."[81]  Although Plaintiff cites public filings, court decisions, and newspaper articles about whether certain conduct engaged in by 888, NETeller, and other companies violated federal and state law, he cites nothing suggesting any Defendants knew or

---

[79]    *Id.* at 130.

[80]    *See In re Walt Disney*, 906 A.2d at 64, 66-67.  Plaintiff does not allege "subjective bad faith," which would require a showing that Defendants intended to harm the Fund.  *See id.* at 64.

[81]    *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (emphasis added).

should have known that passive investments in publicly traded securities could violate federal or state anti-gambling laws.  As demonstrated above, such investments do not violate federal or state law, and Plaintiff has conceded that no court has held otherwise, meaning that Plaintiff cannot point to any "red flags."  Indeed, in *World Interactive Gaming* (cited extensively in the Complaint), the New York Attorney General treated investors as victims rather than criminals.[82]

The Complaint also fails to allege intentional failure to act in the face of a known duty to act.  Plaintiff alleges that Defendants knew of the risk that 888 and NETeller's businesses might be harmed by a federal crackdown on illegal gambling operations, but nonetheless invested.[83]  But allegations that there was a known potential risk when an investment decision was made are insufficient to plead that Defendants disregarded a duty to protect the Fund from investment losses.[84]  Indeed, the fact that the Fund had significantly positive returns during the period it was invested in 888 and NETeller means Plaintiff could not allege that the Defendants disregarded a duty to protect the Fund from investment losses, because there is no duty to protect a mutual fund from all losses on every investment.[85]

Plaintiff also makes conclusory allegations that if the Defendants were unaware of the risks posed to 888 and NETeller by a crackdown by federal authorities, then Defendants failed in their duties to conduct due diligence or oversee the investment process.[86]  But Plaintiff pleads no *facts* demonstrating how the Defendants' "oversight mechanisms" or due diligence processes were "inadequate," or how the Defendants "knew of these inadequacies and

---

[82]  *See* 714 N.Y.S.2d at 848.

[83]  Compl. ¶¶ 56-57.

[84]  *See Citigroup*, 964 A.2d at 130.

[85]  Put differently, all investment funds are expected to suffer some losses on some of their investments — that is an almost inevitable consequence of portfolio diversification.

[86]  Compl. ¶¶ 56-57.

consciously ignored them," the requirements for pleading this sort of claim.  Indeed, the

Complaint actually pleads that the Defendants fulfilled their duties by "develop[ing] and

implement[ing] [an] investment strategy" for the Fund.[87]  Under *Iqbal*, this means that Plaintiff's

allegations cannot be deemed plausible, and so they fail.

### 2.    *The Complaint Does Not Plead Gross Negligence*

Gross negligence is "a reckless indifference to or a deliberate disregard of the

whole body of stockholders[] or actions which are without the bounds of reason."[88]  The

definition of gross negligence used in Delaware is "extremely stringent."[89]  Plaintiff has not

adequately pleaded gross negligence under the Delaware standard.

Plaintiff alleges that Defendants invested in 888 and NETeller despite knowing

that these companies were involved in illegal gambling operations and could be devastated by an

impending crackdown by federal authorities.[90]  But such allegations regarding two investments

in the Fund's portfolio are, without further allegations regarding the entire portfolio, insufficient

to support a gross negligence claim.  A portfolio containing some higher-risk investments may

be overall less risky than individual investments in the same instruments.[91]  In such a portfolio,

some investments will be expected to lose money, sometimes as a result of known risks, but the

portfolio may still be very profitable (as was the case here).[92]  A trustee or investment manager

---

[87]    Compl. ¶ 12.

[88]    *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008).

[89]    *Id.* at 652.

[90]    Compl. ¶¶ 57, 85.

[91]    *See* Paul G. Haskell, *The Prudent Person Rule For Trustee Investments and Modern Portfolio Theory*, 69 N.C. L. Rev. 87, 100-04 (1990) (Henkin Decl. Exh. F).

[92]    *See id.*; *see also Citigroup*, 964 A.2d at 126 ("Businesses — and particularly financial institutions — make returns by taking on risk; a company or investor that is willing to take on more risk can earn a higher return.").

overseeing a portfolio of investments thus cannot be found grossly negligent based on the

performance of one or two investments in the portfolio; their investment behavior can only be

evaluated according to the composition and performance of the entire portfolio.[93]  Delaware has

in fact codified this principle, requiring that courts considering "the propriety of an investment

decision" examine "the inherent nature and expected performance of the investment

portfolio ... ."[94]

      Perhaps not surprisingly, Plaintiff fails to make a single allegation regarding the

Fund's portfolio as a whole.  In fact, the Fund's share price increased 23.25% over the time

period it owned stock in 888 and NETeller, compared to the Dow Jones Industrial Average and

the S&P 500, which increased 16.85% and 14.66%, respectively, over the same period.[95]  All

Plaintiff alleges is that the 888 and NETeller investments lost money.  Because Plaintiff has

failed to allege any facts regarding the composition or performance of the Fund's entire

portfolio, such allegations are insufficient to support a theory that Defendants' investment

decisions were grossly negligent.

      Plaintiff also makes conclusory allegations that if Defendants were unaware of

888 and/or NETeller's alleged involvement in illegal gambling or the impending crackdown by

federal authorities, then Defendants did not adequately conduct due diligence or oversee the

investment process.  But such allegations are not supported by any *factual* allegations regarding

Defendants' due diligence or oversight efforts, such as allegations about the due diligence that

the Investment Adviser Defendants conducted, what a reasonable person could have concluded

---

[93]     *See Citigroup*, 964 A.2d at 126.

[94]     12 Del. C. § 3302(c).

[95]     *Compare* Complaint ¶¶ 46, 50 (alleging that Fund owned stock in 888 and NETeller between September 1, 2005 and November 30, 2006) *with* Henkin Decl. Exh. B (Fund, Dow Jones Industrial Average, and S&P 500 prices during same period).

about the overall risks of the Fund's portfolio or particular investments, or how the Trustee Defendants supposedly failed to properly oversee the Fund's investment process. As in *Citigroup*, Plaintiff simply relies on the flawed logic that, because the 888 and NETeller investments lost value, Defendants must have breached their duties to conduct due diligence or oversee the investment process.[96] But the only particularized allegations in the Complaint are actually inconsistent with wrongdoing — Plaintiff affirmatively pleads that the Trustee Defendants hired a professional adviser for the Fund, developed and implemented investment strategies for the Fund, voted at annual meetings of the companies in which the Fund invested, and received regular reports regarding the Fund.[97] All of Plaintiff's factual allegations are far more consistent with the Defendants upholding the interests of the Fund rather than with gross negligence. The claims must therefore be dismissed under *Iqbal*.

### C.   Plaintiff Cannot State a Claim for Breach of Fiduciary Duty Against the Investment Adviser Defendants

When a dispute relates to obligations that arise under a contract, that dispute should be treated as a breach of contract claim, and any breach of fiduciary duty claims relating to the same contract should be dismissed.[98] Here, the relationship between the Fund and the Investment Adviser Defendants is governed by the Management Agreement, which provides that "[t]he Manager shall ... determine ... securities to be purchased ... by the [Fund] and implement those decisions" and that "[t]he Manager shall carry out its duties ... in accordance with applicable law ... ."[99] Plaintiff's claim that the Investment Adviser Defendants breached their

---

[96]   *See* Compl. ¶¶ 57-58; *Citigroup*, 964 A.2d at 128.

[97]   Compl. ¶¶ 41, 54, 57-58, 97.

[98]   *See Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

[99]   Management Agreement § 1.1 (Henkin Decl. Exh. G).

fiduciary duties is governed by these parts of the Management Agreement.[100]   The claim should
therefore be dismissed because it is contractual rather than tort-based.

### D.      The Complaint Fails to State a Claim for Waste

Delaware courts define corporate waste as "an exchange that is so one-sided that
no business person of ordinary, sound judgment could conclude that the corporation has received
adequate consideration."[101]   To plead waste, a plaintiff must plead that the defendants
"irrationally squander[ed] corporate assets — for example, where the challenged transaction
served no corporate purpose or where the corporation received no consideration at all."[102]
Courts have consistently held that corporate waste claims trigger "an extreme test, very rarely
satisfied by a shareholder plaintiff."[103]   As the Delaware Chancery Court explained in another
case, "[i]f given the facts pled in the complaint, 'any reasonable person might conclude that the
deal made sense, then the judicial inquiry ends.'"[104]   Although the test for waste is sometimes
phrased in different ways, its core is that a waste claim requires a plaintiff to plead that no
sensible person would have engaged in the transaction being attacked.

Plaintiff's waste claim does not even come close to meeting this test.   The
Complaint does not allege that the Fund "received no consideration"[105] for its 888 and NETeller

---

[100]    Compl. ¶ 128.

[101]    *Brehm*, 746 A.2d at 263 (citations omitted); *see also White v. Panic*, 783 A.2d 543, 554
(Del. 2001) ("an exchange of corporate assets for consideration so disproportionately
small as to lie beyond the range at which any reasonable person might be willing to
trade").

[102]    *White*, 783 A.2d at 554 (Del. 2001) (quotation and citation omitted); *see also Brehm*, 746
A.2d at 263.

[103]    *Zupnick v. Goizueta*, 698 A.2d 384, 387 (Del. Ch. 1997).

[104]    *In re Lear Corp.*, 967 A.2d at 656.

[105]    *White*, 783 A.2d at 554.

investments, or even that the Fund paid too much for those investments.[106]  Plaintiff concedes

that the Fund purchased and sold shares in LSE-listed companies in open-market, arms-length

transactions, received and owned those shares, and took normal actions for shareholders (such as

voting those shares).  And in each transaction, including when then Fund sold the shares, there

was someone (presumably also rational) willing to take the other side of the transaction in an

impersonal market (the LSE), meaning that Plaintiff cannot show that no reasonable person

would have engaged in the transactions.  The sole basis Plaintiff pleads for the waste claim is

that the 888 and NETeller investments were "illegal."[107]  As demonstrated above, that argument

has no merit.  Other than that, all the Complaint alleges is that the Fund lost money on the 888

and NETeller investments.  But Delaware does not permit fiduciaries to be held liable in waste

based on alleged underperformance of a subset of publicly traded investments out of a portfolio

that otherwise met a fund's overall investment objectives.[108]  And it could not be any other way,

for if this sort of pleading sufficed to assert a waste claim then every allegedly losing investment

could be challenged as "waste," which would be inconsistent with the fact that waste claims in

Delaware are the exception rather than the rule.

---

[106]   Nor could Plaintiff allege anything like this, because according to Plaintiff the public
(and thus the markets) knew about the potential that 888 and NETeller might be impacted
by a federal crackdown on Internet gambling at all relevant times.  *See* Compl. ¶¶ 28-30,
34, 70.  But the efficient market hypothesis thus dictates that the market prices for 888
and NETeller (the prices the Fund paid and received) accurately reflected the value of the
securities, including that information, at all relevant times.  *See Basic Inc. v. Levinson*,
485 U.S. 224, 245-47 (1988).

[107]   Compl. ¶¶ 139-40.

[108]   *See* 12 Del. C. § 3302(c).

## CONCLUSION

For all the foregoing reasons, the Complaint should be dismissed in its entirety. And the dismissal should be with prejudice. Plaintiff and his counsel have had numerous opportunities to plead and refine their claims in this case and others like it; that alone is sufficient to warrant dismissal with prejudice.[109]

Dated: February 22, 2011

MILBANK, TWEED, HADLEY & McCLOY
LLP

By: _____

James N. Benedict
jbenedict@milbank.com
Douglas W. Henkin
dhenkin@milbank.com
C. Neil Gray
cngray@milbank.com
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Attorneys for Defendants Neuberger Berman Management LLC, Neuberger Berman, LLC, Benjamin Segal, Milu E. Komer, Peter E. Sundman, and Jack L. Rivkin*

---

[109] Moreover, Plaintiff has actively tried to avoid having this Court decide whether the Complaint states a claim and has conceded that his demand allegations have always been baseless; indeed, the timing of Plaintiff's about-face regarding demand appears to have been intended solely to delay this Court's review of the merits. *See* Henkin Decl. ¶¶ 9-10.