UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENJAMIN M. GAMORAN, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the Neuberger Berman International Fund,

Plaintiff,

- against –

NEUBERGER BERMAN MANAGEMENT LLC, NEUBERGER BERMAN, LLC, BENJAMIN SEGAL, MILU E. KOMER, PETER E. SUNDMAN, JACK L. RIVKIN, JOHN CANNON, FAITH COLISH, MARTHA C. GOSS, C. ANNE HARVEY, ROBERT A. KAVESH, HOWARD A. MILEAF, EDWARD I. O'BRIEN, WILLIAM E. RULON, CORNELIUS T. RYAN, TOM D. SEIP, CANDACE L. STRAIGHT, AND PETER P. TRAPP,

Defendants,

- and -

NEUBERGER BERMAN EQUITY FUNDS d/b/a NEUBERGER BERMAN INTERNATIONAL FUND,

Nominal Defendant.

10 CIV. 6234 (LBS) (MHD)

ECF Case

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

**HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP**
112 Madison Avenue
New York, New York 10016
(212) 784-6404

*Attorneys for Plaintiff*

March 25, 2011

TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .............................................................................1

STATEMENT OF FACTS ....................................................................................3

APPLICABLE LEGAL STANDARDS ...............................................................14

ARGUMENT ......................................................................................................15

I.    By Seeking a Ruling on the Merits, Defendants Have Waived the Demand
      Requirement ..............................................................................................15

II.   In the Alternative, the Action Should Be Stayed Pending a Decision by the Board
      on Plaintiff's Demand for Action ..............................................................18

III.  Defendants Caused Nominal Defendant to Violate § 1955 – and They Violated It
      Themselves ................................................................................................19

      A.    Section 1955 Is Clear and Unambiguous ..........................................19

      B.    The Companies That Nominal Defendant Owned Were "Illegal Gambling
            Businesses" ..........................................................................................20

      C.    Nominal Defendant "Owned" the Gambling Businesses ....................21

      D.    This Case Does Not Involve Any "Extraterritorial" Application of Section
            1955 ....................................................................................................22

      E.    There Are No Implied Exceptions to § 1955 ......................................23

            1.   There Is No Implied Exception for Minority or Small Owners ...........23

            2.   There Is No Implied Exception for Passive Owners ..........................24

            3.   There Is No Implied Exception for Ignorant Owners ........................26

            4.   There Is No Implied Exception for Publicly-Owned Illegal Gambling
                 Businesses ........................................................................................28

            5.   There Is No Implied Exception for Foreign Illegal Gambling Businesses ...........29

IV.   Defendants Violated RICO ........................................................................29

V.    The Complaint Adequately Alleges Predicate Violations of State Gambling Laws ...30

VI.    State Anti-Gambling Laws Are Not Unconstitutional ..................................................31

VII.    Plaintiff Has Adequately Pleaded Her Common Law Claims .....................................32

  A.    Choice of Law ...........................................................................................................32

  B.    Plaintiff Has Adequately Pleaded a Claim for Negligence ....................................33

    1.    *Defendants Had Duties of Care, Good Faith, and Loyalty* ...................................33

    2.    *Defendants Breached Their Duties* ........................................................................33

    3.    *The Complaint Adequately Alleges Proximate Cause* ...........................................39

  C.    The Breach of Fiduciary Duty Claim Is Not Barred by Any Contract .................40

  D.    Plaintiff Has Stated a Claim for Waste .................................................................41

VIII.    If the Complaint Is Insufficient, Leave to Amend Should Be Granted ......................42

CONCLUSION .........................................................................................................................42

TABLE OF AUTHORITIES

*Page*

## Cases

*Abbey v. Computer & Communications Tech. Corp.*, 457 A.2d 368 (Del. Ch. 1983)............ 15, 18

*Agency Rent-A-Car, Inc. v. Gateway Indus., Inc.*, 1980 WL 3040 (Del. Ch. 1980)..................... 41

*Beard Research, Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010), *aff'd*, 11 A.3d 749 (2010) ............. 33

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................. 14

*Boyle v. United States*, 129 S. Ct. 2237 (2009)........................................................ 24

*Brehm v. Eisner,* 746 A.2d 244 (Del. 2000) ........................................................... 41

*Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005),.................................... 32

*Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440 (2003) .............................. 21

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................ 14

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ...................................................... 30

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308 (1980)...................................... 39

*DeSimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007)............................................ 34, 41

*Exxon Corp. v. Hunt*, 475 U.S. 355 (1986)............................................................ 24

*Gamoran v. Neuberger Berman Mgmt. LLC*, 08 Civ. 10807 (DLC)............................................ 11

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch 2003) ..................................................... 35

*Hartsel v. Vanguard Group, Inc.*, No. 5394-VCS (Del. Ch. 2010) ................................... 12

*Henik ex rel. LaBranche & Co., Inc. v. LaBranche*, 433 F. Supp. 2d 372 (S.D.N.Y. 2006)........ 18

*Ikuno v. Yip*, 912 F.2d 306 (9th Cir. 1990) ......................................................... 30

*In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219 (1993)............................................ 32

*In re Am. Intern. Group, Inc.*, 965 A2d 763 (Del. Ch . 2009), *aff'd,* 11 A.3d 228 (2011) .......... 16

*In re Bank of New York*, 35 N.Y.2d 512 (1974) ...................................................... 38

*In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009) .......................... 36

*In re Crazy Eddie Secs. Litig.*, 747 F. Supp. 850 (S.D.N.Y. 1990) ............................................... 18

*In re Delaware Sports Service*, 196 A.2d 215 (Del. Super. 1963) ................................................. 36

*In re InfoUSA, Inc. Shareholders Litigation*, 2008 WL 762482 (Del. Ch. 2008)......................... 18

*In re Lear Corp. S'holder Litig.*, 967 A.2d 640 (Del. Ch. 2008).................................................... 36

*In re Sapient Corp. Deriv. Litig.*, 555 F. Supp. 2d 259 (D. Mass. 2008)...................................... 18

*In re Take-Two Interactive Software, Inc. Derivative Litigation*, 2007 WL 1875660 (S.D.N.Y. 2007) ........................................................................................................................................ 18

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006)......................................... 35, 41

*Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377 (Del. Ch. 1999) .................................. 25, 41

*Jones v. Crawford*, 1 A.3d 299 (Del. 2010)............................................................................. 39, 40

*Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A2d 726 (Del. 1988) .................................... 16, 17

*Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987) ............................................................................... 18

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) .............................................................. 39

*McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009)................. 11, 39

*McBrearty v. Vanguard Group, Inc.*, 353 Fed. Appx. 640 (2d Cir. Nov. 23, 2009), *cert. denied*, 130 S. Ct. 3411 (2010)................................................................................................................ 12

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techn., Inc.*, 854 A.2d 121 (Del. Ch. 2004) ............................................................................................................................... 35, 37, 40

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ............................... 25

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) ......................................................................... 41

*Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759 (3d Cir. 1974) ................................................... 35, 41

*Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869 (2010) ........................................................... 22

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010)............................................................................. 40

*New Haverford P'ship v. Stroot, 772 A.2d 792 (Del. 2001)* ......................................................... 33

*Olson v. Motiva Enterprises, L.L.C.*, 2003 WL 21733137 (Del. Super. 2003) ............................ 40

*People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 1999) .......................................................................................................................................... 5

*Perrin v. United States*, 444 U.S. 37 (1979) ............................................................... 21

*Pinkerton v. United States*, 328 U.S. 640 (1946) ....................................................... 19

*Pope v. Halloran*, 76 A.D.2d 770 (1st Dep't 1980) .................................................... 21

*Richardson v. United States*, 526 U.S. 813 (1999) ..................................................... 19

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288 (1st Dep't. 2003) .............. 40

*Rousso v. State*, 170 Wash. 2d 70, 239 P.3d 1084 (2010) (*en banc*) ........................................ 31

*Salinas v. United States*, 522 U.S. 52 (1997) ............................................................ 19

*Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972) ...................................................... 33

*Sanabria v. United States*, 437 U.S. 53 (1978) .......................................................... 19

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91 (2d Cir.1997) ...................................... 30

*Sedima, S.P.R.L. v Imrex Co., Inc.*, 473 US 479 (1985) ................................................ 20, 30

*Smith v. Hurd*, 53 Mass. 371 (1847) ................................................................... 27

*SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352 (1st Dept. 2004) ............................................ 32

*Spiegel v. Buntrock,* 571 A.2d 767 (Del. 1990) ...................................................... 16, 17

*State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, 1997 WL 33545763 (Mo. Cir. Ct. 1997) .......... 5

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ...................................................... 14

*Trans World Airlines, Inc. v. Summa Corp.*, 1986 WL 5671 (Del. Ch. 1986) ................................. 38

*United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999) ............................................... 26, 35

*United States v. BetOnSports PLC*, 2006 WL 3257797 (E.D. Mo. 2006) ........................................ 9

*United States v. Bridges*, 493 F.2d 918 (9th Cir. 1974) .............................................. 24, 28

*United States v. Busacca*, 936 F.2d 232 (6th Cir.1991) .................................................. 30

*United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001) ...................................................... 5

*United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000) ................................................... 25

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ..................................................... 5

*United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) ............................................... 25, 26

*United States v. Merrell*, 701 F.2d 53 (6th Cir 1983) .................................................................. 21

*United States v. Tedder*, 403 F.3d 836 (7th Cir. 2005) ................................................................ 26

*Weinberger v. Lorenzo*, 1990 WL 156529 (Del. Ch. Oct.12 1990) ............................................ 21

*White v. Panic*, 783 A.2d 543 (Del. 2001) ................................................................................... 41

*Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981) ...................................................... 15, 17

## Statutes and Rules

12 Del. C. § 3302(c) ....................................................................................................................... 38

18 U.S.C. § 1955 ............................................................................................................................... 5

18 U.S.C. § 1955(b)(1) .................................................................................................................. 24

18 U.S.C. § 1961(1)(B) .................................................................................................................. 29

18 U.S.C. § 1961(5) ....................................................................................................................... 30

18 U.S.C. § 1962(c) ................................................................................................................. 29, 33

18 U.S.C. § 2 ................................................................................................................................... 19

Fed. R. Civ. P. 14(a)(2) ................................................................................................................. 42

N.Y. Penal Law § 225.05 ......................................................................................................... 10, 31

Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922 .................................... 33, 34

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ........................... 11

Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* ........................ 9

## Other Authorities

C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research
Service (Updated February 27, 2006) ..................................................................................... 4

H.R. Rep. No. 91-1549, 91st Congr. 2d Sess., 2 U.S. Code Cong. & Admin. News at 4029
(1970) ..................................................................................................................................... 28

Restatement (Third) of Torts § 12 (1999) ..................................................................................... 33

S. Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129 (1979) ..................... 35

## PRELIMINARY STATEMENT

Plaintiff Benjamin M. Gamoran ("Plaintiff") submits this brief in opposition to Defendants' motions to dismiss the complaint.

This is a case about investing in criminal enterprises. The essence of any investment is the right to participate in the profits of the enterprise. If the core activity of the enterprise is illegal, an investment in that enterprise is an attempt to profit from criminal activity. Plaintiff's case is based on the simple premise that it is wrongful for professional asset managers in the U.S. to purchase shares in companies that they know to be "illegal gambling businesses" preying on U.S. citizens in violation of U.S. criminal law. Defendants' conduct was wrongful not only because it violated the fundamental common law principle that one party may not knowingly seek to profit from the wrongful conduct of another, but also because that principle is embodied in a federal criminal statute, 18 U.S.C. § 1955, which makes it a felony to "own all or part of an illegal gambling business."

Defendants seek to avoid liability for two main reasons, both of which lack merit. First, Defendants urge the Court to ignore the plain language of § 1955 and rule that it does not apply to "owning" a "part" of an "illegal gambling business" whose shares are traded on a foreign stock exchange. But there is no good reason to ignore the plain language of the statute under the "rule of lenity" or any other principle of statutory construction. No injustice arises when professional asset managers are held accountable for gambling tens of millions of dollars of other peoples' money in companies that openly flouted U.S. law. There is no danger of "innocent" individuals being rendered unwitting felons, because the shares of the illegal gambling businesses were not traded in the U.S. Therefore, any "individual" investors in the U.S. (if there were any) would not be "innocent" because they would have had to do what Defendants did: travel abroad for the purpose of bringing back contraband. Nor would application of the plain

language of the statute conflict with state corporate law regarding veil-piercing, because no veil is pierced. Those who own part of an illegal gambling business are not *vicariously* liable for the crimes committed by the illegal gambling business. Instead, they are directly liable for their own crime: seeking to profit from ownership of a criminal enterprise. Owners are directly guilty under § 1955 for the separate crime of "owning" an illegal gambling business, just as the executives of the businesses are directly guilty, *inter alia,* of "managing" and "supervising" them. Both are separate crimes from each other and from the separate crimes committed by the companies themselves, and neither can complain of being found vicariously guilty by virtue of veil-piercing. Finally, a refusal to apply the plain language of § 1955 to Defendants' conduct would risk creating foreign havens for illegal conduct. If the statute were interpreted as Defendants propose, criminal organizations established for the primary purpose of violating U.S. criminal prohibitions would be able gain access to the U.S. capital markets by simply listing on a foreign stock exchange.

While it is true that § 1955 has never been applied to shareholders of a company whose shares are traded on a foreign stock exchange, it has only been in comparatively recent years that Internet companies whose core business was devoted to flouting U.S. gambling laws have elected to issue stock to the public in foreign countries. Because this case presents an issue of first impression, it is particularly important for this Court to set the proper precedent – upholding the express command of U.S. criminal law and discouraging criminal enterprises from accessing U.S. investor capital in the future through a judicially-created loophole. This is especially so because the threat of continuing illegality has not ended. Illegal gambling businesses continue to

flout U.S. law from abroad, continue to generate hundreds of millions of dollars preying on U.S. citizens, and continue to seek access to public capital markets.[1]

Second, Defendants claim that they cannot be liable under the common law because, they say, the risk of loss in investing in illegal gambling businesses was a legitimate business risk protected by the business judgment rule. They equate their investments in criminal organizations with investing in subprime mortgages. The flaw in this argument is that it can *never* be proper to knowingly seek to profit from an illegal revenue stream, no matter how profitable the investment may appear. For example, an investment in an illegal drug cartel could never be justified by the argument that only a small fraction of all cocaine entering the U.S. is intercepted by law enforcement – making cocaine more profitable and less risky than municipal bonds. Even though (a) § 1955 does *not* apply to drug cartels (because they are not "illegal gambling businesses"); (b) there is no federal criminal statute that explicitly makes it a felony to "own all or part" of a drug cartel; and (c) the risk to reward ratio for cocaine may make it a more attractive investment than an investment in municipal bonds, it would never be permissible for an asset manager to commit U.S. investor capital to support an illegal drug cartel. This is because, by its nature, an "investment" in an illegal business can only provide a positive return through the continuation of a revenue stream earned in violation of U.S. law and public policy.

### STATEMENT OF FACTS

Plaintiff is a shareholder in a mutual fund: nominal defendant Neuberger Berman Equity Funds ("Nominal Defendant") through its Neuberger Berman International Fund (the "Fund"). Defendants – the fiduciaries who managed the mutual fund – knowingly caused Nominal Defendant to invest in NETeller Plc ("NETeller") and 888 Holdings PLC ("888"), illegal Internet

---

[1] Such illegal gambling businesses include, for example, PokerStars (www.PokerStars.com), UltimateBet (www.ub.com), and Full Tilt poker (www.FullTiltePoker.com).

gambling businesses that earned most of their revenues from gamblers in the United States in violation of U.S. anti-gambling laws:. (Compl. ¶¶ 26, 32) The value of the illegal gambling businesses – the shares of which were traded only on foreign exchanges and not in the U.S. because of their illegality – plummeted after federal and state law enforcement authorities in the United States launched a crackdown in 2006 that choked off the foreign gambling companies' primary source of revenue. (Compl. ¶¶ 1, 71-84) The stock that Defendants purchased on behalf of the mutual funds lost all of the value attributable to the illegal revenue. (Compl. ¶¶ 85-91)

Nominal Defendant is a Delaware statutory trust with its principal place of business in New York. It is registered under the Investment Company Act of 1940 as an open-end management investment company – more commonly referred to as a mutual fund. The Fund is not a separate legal entity. It is a segregated portfolio of securities owned by Nominal Defendant that is treated as a separate legal entity for certain purposes by the SEC. (Compl. ¶¶ 8-9)

Based in the Isle of Man, NETeller first traded on the London Stock Exchange ("LSE") in 2004. NETeller generated 90% of its revenue by aiding and abetting illegal gambling by transferring funds and processing payments for the illegal Internet gambling industry. NETeller disclosed in its prospectus that the U.S. Department of Justice considered that NETeller's principal operations violated various criminal statutes in the U.S. and that there "could be no assurance that the US will not threaten or try to prosecute the NETeller Group under federal law at some stage under existing or future regulations." (Compl. ¶¶ 31-34, 70)

All fifty states have laws that prohibit unregulated gambling. *See United States v. BetOnSports PLC*, 2006 WL 3257797 (E.D. Mo. 2006); C. Doyle, *Internet Gambling: Overview of Federal Criminal Law*, Congressional Research Service (Updated February 27, 2006) at Ex. A.   By the time NETeller went public in 2004, it was well-established that gambling

businesses located outside the U.S. violate the criminal laws of individual states when they take wagers from gamblers in those states. (Compl. ¶¶ 60-63) In *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 1999), the Court had held that an Antiguan corporation that took bets over the Internet from gamblers in New York was engaged in illegal gambling in violation of New York law. Similarly, in *State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, 1997 WL 33545763 (Mo. Cir. Ct. 1997), the court had held that a foreign business violates Missouri anti-gambling laws, when it provides gambling-related services to a Missouri resident over the Internet. (*See also* Compl. ¶¶ 64-70, 82-84)

By 2004, it was also well-established that gambling businesses located outside the U.S. violate U.S. criminal law when they take wagers from gamblers in the U.S. or process payments relating to those wagers. (Compl. ¶¶ 58-59) For example, Jay Cohen was convicted in February 2000 of running an Internet gambling business. On appeal, the Second Circuit had held that Cohen and his organization – the Antiguan corporation that had been the subject of *World Interactive* – violated the federal law whenever there "was a telephone call or an internet transmission between New York and [defendant] in Antigua" that facilitated a bet or wager on a sporting event. *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001). Similarly, in *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), the Court had affirmed a 2003 conviction under 18 U.S.C. § 1955 (illegal gambling) predicated on a violation of Article 225 of the N.Y. Penal Law (illegal gambling), holding that "[w]hen bets are placed from New York, the gambling activity is illegal under New York law, regardless of whether the activity is legal in the location to which the bets were transmitted." 459 F.3d at 340.

888 is an Internet gambling company located in Gibraltar. (Compl. ¶¶ 22-24) Its stock began trading on the LSE in 2005. It derived approximately 55% of its $271 million in annual

revenue illegally – from bets placed by gamblers in the U.S. Accordingly, its principal operations violated the anti-gambling laws of every state in the U.S. as well as federal anti-gambling laws. (Compl. ¶¶ 26-27)

In connection with its initial public offering in 2005, 888 warned investors that it was "exposed to legal and regulatory risks due to the level of revenue generated" from gamblers in the U.S. (Compl. ¶¶ 28-29) In its 2005 Annual Report, 888 cautioned investors that "there [were] significant risks, unique to the online gaming industry, including in the USA where members of 888 generated 55% of our Net Gaming Revenue in 2005." The company also noted that there were Congressional efforts under way to choke off the ability of online gambling companies to process financial transactions associated with illegal gambling. (Compl. ¶ 30)

When they listed their shares on the LSE, 888 and NETeller sought to evade the reach of the U.S. criminal justice system by not offering their shares for sale to, or for the benefit of, persons in the U.S. They did not list the shares to be traded on any U.S. exchange through American Depository Receipts or otherwise. In order to acquire shares in those companies on behalf of Nominal Defendant, Defendants had to circumvent those restrictions. (Compl. ¶ 38)

Between September 1, 2005 and August 31, 2006, Defendants caused Nominal Defendant, through Fund, to purchase approximately 2.4 million shares of NETeller valued at nearly $19 million. (Compl. ¶¶ 44-50) Between December 1, 2005 and August 31, 2006, Defendants caused Nominal Defendant, through Fund, to purchase approximately 4.5 million shares of 888 having a market value of over $13 million. (Compl. ¶¶ 44-45)

Through their own professional due diligence investigations, and through numerous publicly-available sources of information, including news media, government sources, and information provided by the illegal gambling companies themselves, at the time of the

investments, Defendants knew that the illegal gambling businesses in which they caused Nominal Defendant to invest got most of their revenue from gambling in the U.S. and that the criminal justice authorities and the courts considered their activities to be criminal. (Compl. ¶¶ 56-57)

Long before Defendants made the investments at issue, the DOJ, the news media, state law enforcement, and even some illegal gambling businesses themselves had made it widely known that the organizations in which Defendants chose to gamble other peoples' money were flouting U.S. law. For example, in 2003, the DOJ issued a public warning letter that "[n]otwithstanding their frequent claims of legitimacy, Internet gambling and offshore sportsbook operations that accept bets from customers in the United States violate Sections 1084, 1952, and 1955 of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who aids or abets in the commission of any of the above-listed offenses is punishable as a principal violator of those statutes." The Court may take judicial notice of the letter, which is referred to in Paragraph 117(b) of the complaint.[2] *See also* Testimony of John G. Malcolm, Deputy Assistant Attorney General, Criminal Division, United States Department of Justice, Before the Committee on Banking, Housing, and Urban Affairs, United States Senate (Mar. 18, 2003).[3]

The illegal gambling businesses made no secret of the legal risks they were taking. In 2005, *The New York Times* reported that, for one of the largest Internet gambling companies, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan." K. Eichenwald, *At PartyGaming, Everything's Wild*, N.Y. Times, June 26,

---

[2] A copy is available at http://www.igamingnews.com/articles/files/NAB_letter-030611.pdf.

[3] A copy is available at http://www.justice.gov/criminal/cybercrime/malcolmTestimony318.htm.

2005.[4] *The New York Times* also reported that "Internet casinos are outlaw operations in the eyes of the federal government." M. Ritchel, *Wall St. Bets on Gambling on the Web*, N.Y. Times, December 25, 2005.[5]

Eager to share in the illicit profits being made by companies like NETeller and 888, some members of the investment community, chose to ignore the illegality and bought the stock anyway. As the *Times* reported in December 2005, "investment houses have taken the position that they indeed know there are legal risks involved in investing in offshore casinos, but that the risks are outweighed by the benefits of owning shares in growing, highly profitable businesses." Upon learning of this, one member of Congress said that if "investment houses are knowingly supporting and promoting illegal [Internet gambling] enterprises [that would be] very bad, and Congress ought to investigate it." (Compl. ¶ 117(a))

Nominal Defendant's investments in NETeller and 888 were not passive. Defendants caused Nominal Defendant to attend by proxy the annual meetings of both NETeller and 888 during the time of its ownership of their shares and to vote in favor of their managements and their managements' recommendations. The directors and executives for whom Defendants caused Nominal Defendant to vote were criminals – engaged in operating NETeller and 888 as illegal gambling businesses in violation federal law and the anti-gambling laws of all fifty states – and Defendants knew that they intended to continue operating NETeller and 888 as illegal gambling businesses. (Compl. ¶¶ 51-55)

On June 1, 2006, a grand jury in Missouri indicted London-based BetOnSports Plc ("BetOnSports") – another unlawful Internet gambling business – for racketeering, mail fraud, and running an illegal gambling enterprise, because it was accepting wagers from U.S. bettors in

---

[4] A copy is available at http://www.nytimes.com/2005/06/26/business/yourmoney/26poker.html.

[5] A copy is available at www.nytimes.com/2005/12/25/business/25gamble.html?pagewanted=all.

violation of U.S. law. The grand jury also indicted BetOnSports' Chief Executive Officer David Carruthers and thirteen others. *United States v. BetOnSports Plc*, 4:06-CR-00337-CEJ (E.D. Mo.). The indictment was filed under seal, so investors did not learn about it until July 16, 2006, when Carruthers was arrested. In a companion civil RICO action, the federal court in Missouri issued a temporary restraining order against BetOnSports enjoining it from "operating an illegal gambling business through Internet web sites and telephone services." *United States v. BetOnSports Plc*, 4:06-CV-01064 CEJ (E.D. Mo.). (Compl. ¶¶ 71-73). The Court later made the injunction permanent, finding among other things that Internet gambling involving interstate or international wire transmissions is not legal anywhere in the United States, except as explicitly authorized by statute. *BetOnSports PLC*, *supra,* 2006 WL 3257797.

The U.S. government's increased enforcement efforts directed at putting a stop to illegal Internet gambling included legislative efforts intended to make it more difficult for illegal Internet gambling businesses to transfer the proceeds of illegal gambling. The Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* ("UIGEA") made it unlawful to transfer funds to or from illegal gambling businesses. (Compl. ¶¶ 76-78)

Soon after passage of the UIGEA, 888 voluntarily withdrew from the U.S. gambling market, but NETeller did not. 888 was not prosecuted, but NETeller was. Although NETeller and its executives generally followed a strict policy of avoiding a physical presence in the U.S. to evade arrest, in January 2007, federal criminal proceedings were commenced against NETeller and its founders when federal law enforcement finally tracked and arrested NETeller's founders when their airplane landed in the U.S. Virgin Islands. The criminal information against NETeller founder Stephen Lawrence charged that he "did conduct, finance, manage, supervise, direct and own all and part of various illegal gambling businesses, namely internet gambling companies

doing business in New York in violation of New York State Penal Law, Article 225, in violation of Title 18, United States Code, Section 1955." Criminal Information ¶ 3, *United States v. Lawrence*, 07 Cr. 597 (S.D.N.Y.) (available on Pacer). Lawrence pleaded guilty. Docket Sheet, *United States v. Lawrence*, 07 Cr. 0597 (S.D.N.Y.) (available on Pacer). (Compl. ¶ 35) NETeller's business violated N.Y. Penal Law § 225.05, because, although it did not engage in gambling directly, NETeller "knowingly advance[d] or profit[ed] from unlawful gambling activity." (Compl. ¶¶ 35-37, 79-84)

The federal government also proceeded against NETeller itself. The criminal information against NETeller contains substantially the same allegations regarding § 1955 and § 225 as those in the *Lawrence* information quoted above. Pursuant to a July 17, 2007 Deferred Prosecution Agreement with the United States Attorney's Office for the Southern District of New York, NETeller admitted to criminal wrongdoing and agreed to forfeit $136 million in criminal proceeds. NETeller also admitted that 88% of its customers were North American residents, the majority of which were U.S. residents. NETeller stipulated that in 2005, it generated over $120 million in illegal revenue from U.S. residents. (Compl. ¶ 36)

Other illegal gambling businesses and their principals have also been successfully prosecuted. (Compl. ¶¶ 79-84)

The prices of shares of gambling companies that had been illegally taking bets from gamblers in the US – including the shares of 888 and NETeller owned by Nominal Defendant – fell dramatically following the increased law enforcement. Defendants caused Nominal Defendant to sell all of its shares of 888 and NETeller at a loss. Defendants' investments in illegal gambling were the efficient, material, substantial, and proximate cause of the losses suffered by Nominal Defendant. Any other causes that may have contributed to the losses –

including law enforcement efforts or the market reaction to those efforts – were not a superseding cause of the losses because they were reasonably foreseeable and part of the risk that Defendants' wrongful acts created. (Compl. ¶¶ 45, 50, 73, 85-91)

Suing derivatively for the benefit of the mutual fund and his fellow investors, Plaintiff asserts claims for breach of negligence, fiduciary duty, and waste. (Compl. ¶¶ 1-7, 128, 133, 139) In his prayer for relief Plaintiff seeks, among other things, compensatory damages for the Nominal Defendant on behalf of the Fund in an amount estimated to be $30 million and forfeiture and disgorgement of any commissions, fees, or profits received by Defendants in an amount estimated to be $11 million.

On December 12, 2008, Plaintiff sued the same defendants in an action arising from the same transactions and occurrences from which the present action arises. *Gamoran v. Neuberger Berman Mgmt. LLC*, 08 Civ. 10807 (DLC) ("*Gamoran I*"). The complaint in that action asserted claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), as well as the state common law claims in this action.

In *McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009) – a case that involved claims very similar to those asserted in *Gamoran I* – Judge Cote held that (i) the plaintiffs failed to adequately allege RICO causation and (ii) there was no independent basis for federal jurisdiction over the plaintiffs' state claims. The Court dismissed the state claims without prejudice to re-filing in state court.

The *McBrearty* plaintiffs appealed, and while the appeal was pending, the parties in *Gamoran I* entered into a stipulation for the voluntarily dismissal of *Gamoran I* without prejudice to Plaintiff's right to commence a new action following a decision in *McBrearty*. The stipulation, which Judge Cote so ordered, provides, in pertinent part:

1. If plaintiff in this action commences a new action subsequent to the dismissal of this action based on the same transactions and occurrences … that are the subject of the complaint in this action … then:

    a. The date of commencement of the new action shall relate back to the date of commencement of this action; and

    …

    d. Any period of limitations (including laches) applicable to the claims asserted in the complaint in this action shall be tolled from the date this action was commenced until [the issuance of the mandate of the U.S. Court of Appeals in *McBrearty*].

The Second Circuit affirmed *McBrearty*. 353 Fed. Appx. 640 (2d Cir. Nov. 23, 2009), *cert. denied,* 130 S. Ct. 3411 (2010). The *McBrearty* plaintiffs are now pursuing their state common law claims in the Delaware Court of Chancery. *Hartsel v. Vanguard Group, Inc.*, No. 5394-VCS (Del. Ch. 2010).

This action was commenced on July 17, 2010 in New York State Supreme Court and was removed to this Court. Defendants' time to answer or move was adjourned pending determination by this Court of Plaintiff's motion to remand. That motion was finally determined on February 9, 2011. Two days later, on February 11, 2011, Plaintiff proposed to Defendants that this action, including Defendant's time to answer or move, be stayed pending a decision by the Delaware Court of Chancery in *Hartsel*, since that case raised many of the same issues as this case, and defendants' motions to dismiss had been orally argued and taken on submission two days earlier, on February 9, 2011. On February 11, 2011, Defendants' counsel informed Plaintiff that they would consider the proposal for a stay, but that their moving papers in support of motions to dismiss had already been prepared.

On February 16, 2011, Defendants rejected Plaintiff's proposal for a stay. Two days later, on February 18, 2011, Plaintiff made a written demand on the Board of Trustees of Nominal Defendant that they cause Nominal Defendant and the Fund to pursue the claims alleged in the

complaint. At the same time, Plaintiff's counsel advised Defendants' counsel that the demand was being sent. The Board has not yet responded to that demand.

On February 22, 2011, the Adviser Defendants moved to dismiss. In doing so, they seek a decision on the merits, without objecting to Plaintiff's capacity to sue.

On March 1, 2011, Plaintiff proposed to Defendants that this action be stayed pending the Board's response. On March 2, 2011, however, Defendants rejected that proposal.

On March 4, 2011, Trustee Defendants moved against the complaint. In their brief in support of their motion, the Trustee Defendants say that they "take no position on the merits of plaintiff's illegal investment theories." (Trustees' Br. at 5) While they ostensibly ask this Court to dismiss this action, they *also* invoke the court's jurisdiction by asking this Court for a ruling on the merits of Plaintiff's claims. (*Id.*)

Contrary to Defendants' unsupported assertion, although Plaintiff's demand on the board is a waiver of his right to pursue a derivative action on the ground that a demand on the board would have been futile, it was *not* a concession that his allegations of futility "have always been baseless." (Adviser Br. at 4) On the contrary, Plaintiff simply decided that he did not wish to litigate that issue of Delaware law in federal court. Defendants have suffered no unfair prejudice from Plaintiff's demand. Defendants' claim that they had been planning to move to dismiss based in part on Plaintiff's lack of demand. (Adviser Br. at 5-4 & n.19) If they had prevailed on such a motion, Plaintiff would then have been able to make a demand, which is what he has now done. Defendants' complaint about having to prepare motion papers unnecessarily is less than forthcoming with the Court: those papers were originally drafted in response to *Gamoran I* prior to the voluntary dismissal of that case without prejudice – and there was never any genuine need to do any further work on those papers in this case. As soon as it became clear that Plaintiff's

13

motion to remand would not be granted, Plaintiff proposed a stay pending a decision in *Hartsel* –
a case that raises many of the same issues of Delaware law as this case, including demand
futility. At that point, however, Defendants motion papers had already been prepared, and they
were eager to file them. Defendants have no ground to complain. Their strategy of removing this
case from state court to federal court gained them the outcome they wanted without having to
litigate demand futility and risk an adverse decision on that issue.

APPLICABLE LEGAL STANDARDS

Plaintiffs' claims are subject to the general pleading standards of Fed. R. Civ. P. 8(a)(2),
which requires "a short and plain statement of the claim showing that the pleader is entitled to
relief." Under Rule 8(a)(2), the pleading must "give the defendant fair notice of what the ... claim
is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

A complaint governed by Rule 8 need not contain detailed factual allegations. *Id.* Under
Rule 8, a complaint need only allege enough factual matter to suggest that the pleader's
conclusion is plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). This does not
impose a probability requirement at the pleading stage but simply calls for enough facts to raise a
reasonable expectation that discovery will reveal evidence to support the claim. Factual
allegations need only raise a right to relief above the speculative level. *See, e.g., Swierkiewicz v.
Sorema N. A.*, 534 U.S. 506, 508, n. 1 (2002).

When determining the sufficiency of a complaint under Rule 12(b)(6), consideration is
generally limited to the factual allegations in the complaint, but the Court may also rely on
matters of which judicial notice may properly be taken. *Staehr v. The Hartford Financial
Services Group Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Plaintiff requests that this Court take
notice of the contents of documents cited in this brief as well as those cited in the Complaint.

**ARGUMENT**

## I.   BY SEEKING A RULING ON THE MERITS, DEFENDANTS HAVE WAIVED THE DEMAND REQUIREMENT

Defendants refused to stay this action pending a decision by the Board on Plaintiff's demand. Instead, Defendants seek adjudication on the merits. The Trustee Defendants seek the "opinion" of the Court in "addressing the substance of plaintiff's legal theories" (Trustees' Br. at 5). They represent to this Court that resolution of the substantive issues concerning whether there are any viable claims would "substantially assist the board of trustees." (Trustees' Br. at 5) They also tell this Court that the viability of Plaintiff's substantive claims would be a "significant" factor that they must consider in determining whether to allow the suit to move forward under the factors set forth in *Zapata Corp. v. Maldonado*, 430 A.2d 779, 788 (Del. 1981). (Trustees' Br. at 6)

The Trustee Defendants have effectively abdicated responsibility for determining the merits of Plaintiff's claim. They have asked the Court to expend judicial resources to issue a definitive determination of the merits of Plaintiff's claim for them – while purporting to reserve the right to later ignore this Court's decision if it is not to their liking. The Delaware Chancery court has rejected the propriety of such equivocations:

> What the board of directors is purporting to do here, as I see it, is to delegate a final corporate decision as to the merits of suit to the Litigation Committee while attempting to reserve the right to raise technical and procedural defenses to itself. I do not think that this should be permitted. I feel that the board should be required to either fish or cut bait. To do what it is attempting to do here is to avail itself of the *Zapata* decision so as to provide the corporation with two different sets of decision makers … ."

*Abbey v. Computer & Communications Tech. Corp.*, 457 A.2d 368, 373-74 (Del. Ch. 1983). While the board in *Abbey* delegated the decision-making of the merits of the suit to a litigation

15

committee instead of a court, *Abbey*'s reasoning applies even more forcefully here.[6] Trustee Defendants have linked the decision to pursue the Fund's claims to whether the Court believes the claims are viable. If the board believes that this action should be terminated *even if* the Court determines the claims to be viable, then the board was required to affirmatively take that position *before* asking the Court to definitively rule on the merits.

It is important to note that Trustee Defendants have argued that Plaintiff has waived his right to argue that demand on the board was futile. For the *same reason* that a Plaintiff can waive the right to argue demand futility by making a demand, a board *similarly waives* the right to terminate a lawsuit for lack of a demand when the board equivocates. Both types of waiver are based on the same policy considerations. *See Spiegel v. Buntrock,* 571 A.2d 767, 775 (Del. 1990).

Indeed, the Delaware courts consistently have made clear that the demand requirement will not bar a derivative plaintiff from proceeding when the board is deemed to stand neutral. "When a corporation takes a position regarding a derivative action asserted on its behalf, it cannot effectively stand neutral. … [I]t must affirmatively object to or support the continuation of the litigation." *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A2d 726, 731 (Del. 1988); *see In re Am. Intern. Group, Inc.*, 965 A2d 763, 810 (Del. Ch . 2009), *aff'd,* 11 A.3d 228 (2011);

---

[6] The *Abbey* court also opined that its decision might have been different if the board had "merely appointed a committee to investigate the allegations" but did not "surrender[] the ultimate decision on the worthiness of the alleged cause of action … ." 457 A.2d at 374. What Defendant Trustees did here can *only* be described as *surrendering* to the Court the ultimate decision on the worthiness of Plaintiff's causes of action. Unlike the investigations and recommendations of a special committee, this Court's ruling on the legal merits is *definitive.* Once Defendants insist that this Court rule on the merits, they are no longer free to discard the Court's decision as erroneous if they do not like the outcome (as they might be entitled discard the recommendations of a special committee concerning the merits). Therefore, what Defendants have done presents a much stronger case for waiver than in *Abbey.* The Defendant Trustees have *surrendered authoritative decision-making on the merits* to this Court, and that holds much more weight and respect than the recommendations of the special committee in *Abbey.*

*Spiegel,* 571 A.2d at 775 ("[W]hen a board of directors is confronted with a derivative action asserted on its behalf, it cannot stand neutral").

The Defendant Trustees' position therefore "must be viewed as tacit approval for the continuation of the litigation," *see Kaplan*, 540 A.2d at 731, contingent only upon a determination by this Court that Plaintiff's claims are viable. In this respect, Defendants' actions present more compelling case for waiver the defendants' actions in *Kaplan*, *Abbey,* and *In re Am. Intern. Group, Inc.*

Defendant Trustees invoke the standards set forth in *Zapata*. (Trustees' Br. at 6) *Zapata*, however, cautioned that courts must recognize the "potentials for abuse" in allowing a board to terminate a lawsuit with meritorious claims. 430 A.2d at 785. Courts should therefore "find a balancing point where bona fide stockholder power to bring corporate causes of action cannot be unfairly trampled on by the board of directors, but the corporation can rid itself of detrimental litigation." *Zapata*, 430 A.2d at 787. It is difficult to see how Trustee Defendants could genuinely uphold the policy goals of *Zapata* if they chose to forego claims that this Court rules are viable. This is particularly true since the action will not cost the Fund anything unless the suit is successful.

All of the parties seek adjudication on the merits. Defendants have concluded that their litigation strategy is best served by having this Court determine for them the merits of Plaintiff's claims as soon as possible. That being the case, Defendants should be prepared to live with the consequences of their decision, and the action should proceed if the Court determines that Plaintiff's claims are legally viable.

**II.    IN THE ALTERNATIVE, THE ACTION SHOULD BE STAYED PENDING A DECISION BY THE BOARD ON PLAINTIFF'S DEMAND FOR ACTION**

If this Court is inclined to rule that Defendants should not be bound by this Court's determination on the merits, then this case should be stayed and not dismissed. Courts routinely stay derivative actions when a special litigation committee has been formed to determine whether to allow the action to proceed. *See, e.g., In re Take-Two Interactive Software, Inc. Derivative Litigation*, 2007 WL 1875660 (S.D.N.Y. 2007); *In re InfoUSA, Inc. Shareholders Litigation*, 2008 WL 762482, *1 (Del. Ch. 2008); *Abbey*, 457 A.2d at 375.

A stay would be appropriate here to preserve the Fund's substantive rights from possible loss due to the statute of limitations. In *Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987), the court held that the statute of limitations is not tolled for a class action plaintiff when a prior class action is dismissed because class certification is denied. This rule broadly applies where dismissal of the first action is for lack of standing. *See In re Crazy Eddie Secs. Litig.*, 747 F. Supp. 850, 856 (S.D.N.Y. 1990). Some courts have treated demand issues in a derivative context as related to the representative plaintiff's "standing." *See, e.g., Henik ex rel. LaBranche & Co., Inc. v. LaBranche*, 433 F. Supp. 2d 372, 380 (S.D.N.Y. 2006). Accordingly, this Court should stay this litigation pending a response to the demand because it would avoid the possible loss of substantive rights.

Defendants rely on *In re Sapient Corp. Deriv. Litig.*, 555 F. Supp. 2d 259, 263-64 (D. Mass. 2008), for the proposition that this case should be dismissed instead of stayed pending a response from the board. (Trustees' Br. at 3, 4) The Defendants in *Sapient*, however, did not request the court to determine the merits of the plaintiff's claims prior to dismissing the action. Nor did the *Sapient* court have occasion to consider the potential loss of the nominal defendant's substantive rights due to the expiration of the statutes of limitations.

18

### III.   DEFENDANTS CAUSED NOMINAL DEFENDANT TO VIOLATE § 1955 – AND THEY VIOLATED IT THEMSELVES

#### A.   Section 1955 Is Clear and Unambiguous

The plain and unambiguous language of § 1955 expressly prohibits ownership of "all or part of an illegal gambling business." Defendants caused Nominal Defendant to become the owner of millions of shares of illegal gambling businesses that Defendants knew derived most of their revenue from gamblers in the U.S. As a result, Defendants knowingly caused Nominal Defendant to become part owner of entities that they knew to be "illegal gambling businesses" and thereby to violate § 1955. Furthermore, because they aided and abetted Nominal Defendant's violation of § 1955 by causing Nominal Defendant to "own all or part of an illegal gambling business," Defendants are individually liable as principal violators pursuant to 18 U.S.C. § 2. Defendants are also liable as co-conspirators. (Compl. ¶ 41, 115) *See Pinkerton v. United States*, 328 U.S. 640 (1946).

Defendants argue that § 1955 should be construed "narrowly," but the Supreme Court and lower courts have construed § 1955 broadly. In *Sanabria v. United States*, 437 U.S. 54, 70 n.26 (1978), the Supreme Court said, "[n]umerous cases have recognized that [§ 1955(a)] proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor."

When interpreting a statute, the court must look first to the language of the statute. *Richardson v. United States*, 526 U.S. 813, 818 (1999). "Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language." *Salinas v. United States*, 522 U.S. 52, 57 (1997). "[O]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language." *Id*. The "rule of

lenity" invoked by Defendants has no application where, as here, the statute is clear and unambiguous. *Sedima, S.P.R.L. v Imrex Co., Inc.*, 473 US 479, 530 n.10 (1985).

      **B.    The Companies That Nominal Defendant Owned Were "Illegal Gambling Businesses"**

Section 1955(b)(1) defines an "illegal gambling business" as a gambling business that:

    (i) is a violation of the law of a State or political subdivision in which it is conducted;

    (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

    (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955(b)(1). The complaint alleges that the gambling businesses in which Defendants caused Nominal Defendant to invest satisfy each of those three characteristics. First, except for regulated gambling that is permitted in a few jurisdictions, gambling is illegal in all fifty states. Therefore, the illegal gambling companies were violating the laws of at least one state (and probably all fifty). In its Deferred Prosecution Agreement, NETeller admitted that it was an illegal gambling business within the meaning of § 1955, and that charge was predicated on violation of § 225 of the New York Penal Law. (Compl. ¶ 36) Other companies and individuals involved in similar illegal Internet gambling businesses have been successfully prosecuted for federal crimes predicated on violations of state law. (Compl. ¶¶ 81-84, 87) Those successful prosecutions confirm that NETeller and 888 violated one or more predicate state gambling laws. Second, NETeller and 888 are large, publicly-held corporations conducted by at least five people. Third, NETeller and 888 have both been in continuous operation for years, and they both earned tens, if not hundreds, of thousands of dollars a day from illegal gambling in the U.S. (A-26, 79, 87, 286-87, 317)

There is no requirement that a defendant accused of violating § 1955(a) by "own[ing] all or part of an illegal gambling business" meet *also* satisfy the three requirements of § 1955(b)(1). That section merely defines "illegal gambling business." It does not set forth the elements of the crime. Even waiters and janitors have been found to be sufficiently involved with illegal gambling operations to be subjected to criminal liability under § 1955(a), although they, of course, would not satisfy the requirements of § 1955(b)(1). *See United States v. Merrell,* 701 F.2d 53 (6th Cir 1983).

### C.    Nominal Defendant "Owned" the Gambling Businesses

"[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The illegal gambling businesses at issue are corporations. According to the ordinary, contemporary, common meaning of the term, a corporation is "owned" by its shareholders. *See, e.g., Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 442 (2003) (shareholders described as "own[ing]" a professional corporation); *Weinberger v. Lorenzo*, 1990 WL 156529, at *2 (Del. Ch. Oct.12 1990) (shareholders "own" a corporation); *Pope v. Halloran*, 76 A.D.2d 770, 772 (1st Dep't 1980)) ("It is the shareholders who own the corporation"). Indeed, the only way to "own" "all or part" of these illegal gambling businesses was to own their stock – which is exactly what Defendants caused Nominal Defendant to do.

Defendants have suggested that Plaintiff is seeking to "pierce the corporate veil" and impose vicarious liability on shareholders for crimes committed by the corporation. To the contrary, Plaintiff does not seek to hold shareholders *vicariously* liable for the crimes of the gambling companies in which they invested. Rather, the statute makes "ownership" of all or part of an illegal gambling business a crime. As a result, the liability of owners who, like Nominal Defendant, "own[] all or part of an illegal gambling businesses" is *primary*, not vicarious. That

the illegal gambling businesses have chosen to incorporate does not insulate its owners from liability for the crime of ownership.

D.    **This Case Does Not Involve Any "Extraterritorial" Application of Section 1955**

Defendants cite *Morrison v. Nat'l Aus. Bank Ltd.*, 130 S. Ct. 2869 (2010), for the proposition that § 1955 does not apply to them because they purchased the gambling stocks on foreign stock exchanges. Contrary to Defendants' argument, the application of § 1955 to Defendants' conduct is not an *extraterritorial* application of the statute; it is a *domestic* application of the statute.

*Morrison* held that the U.S. securities laws do not apply to purchases and sales of securities outside the U.S. The U.S. securities laws only apply to "purchases and sales of securities in the United States." 130 S. Ct. at 2884. In contrast, this case involves participation in illegal gambling through ownership of illegal gambling businesses – an activity that does not focus on the place where the illegal gambling stock is *purchased* but rather on the place where the *ownership* takes place. Nominal Defendant is a Delaware statutory trust located in New York City. (Compl. ¶ 8) Its *ownership* of the illegal gambling businesses occurred in the U.S. – as, of course, did the illegal gambling.

Defendants say that U.S. courts should "not interfere with foreign corporate or securities regulations." (Br. at 11, n. 46) In prohibiting persons in the U.S. from investing in foreign companies that are preying on U.S. citizens in the U.S., § 1955 does not materially interfere with any legitimate foreign "corporate or securities regulations." It merely prevents criminal enterprises incorporated in foreign countries from accessing U.S. investment capital. Significantly, the terms of 888's and NETeller' securities offerings said that shares would not be sold to, or for the benefit of, persons in the U.S. (Compl. ¶ 38) Thus, the relevant foreign

regulators presumably contemplated that there would be no sales to U.S. persons. If Defendants' arguments were accepted, that would make it possible for foreign governments (not all of whom are friendly to the U.S.) to establish safe havens from which criminal enterprises, funded by investors in the U.S., could violate U.S. criminal law in the U.S.

E.    **There Are No Implied Exceptions to § 1955**

1.    *There Is No Implied Exception for Minority or Small Owners*

Defendants urge this Court to create an exception for ownership of small or minority interests in illegal gambling businesses. That argument flies in the face of the plain language of the statute, which prohibits ownership of "all or part" of an illegal gambling business. Had it wished to do so, Congress could have prohibited ownership of a "majority" or a "controlling" interest in an illegal gambling business. It might have defined a permissible threshold, such as "not more than 5%." It did not do so, because it manifestly intended to prohibit *any* ownership percentage.

Defendants suggest that the plain language of the statute could lead to what they consider to be inappropriate results, such as criminalizing ownership of "one share" of an illegal gambling business. But there is nothing unusual about Congress enacting an absolute prohibition. It has done so in a variety of contexts. In fact, if Defendants' reasoning were applied to other absolute prohibitions, that would produce absurd results: legalizing small amounts of narcotics, nuclear material, stolen property, etc. Defendants' are unable to articulate any standards for the courts to use to determine what amount of ownership would be sufficient to trigger liability for "part" ownership. Their argument fails to account for the fact that "one share" might represent a very large investment; indeed, it could in theory represent 100% ownership. Congress' absolute prohibition makes a lot more sense than Defendants' standardless alternative. In any event, this

case does not involve "one share" or even a small number of shares. It involves millions of shares, having a value measured in the tens of millions of dollars.

2.    *There Is No Implied Exception for Passive Owners*

Citing *United States v. Bridges*, 493 F.2d 918, 922 (9th Cir. 1974), Defendants argue that § 1955(a) should be read "narrowly," so as to exclude "passive" ownership of illegal gambling businesses. (Adviser Br. at 8) *Bridges*, however, merely applied to § 1955(b)(1) the familiar rule that ambiguous or unclear criminal statutes should be strictly construed. It had nothing to do with the interpretation of the word "owns" under § 1955(a), and it certainly did not create any loophole for owners who remain "passive."

Where, as here, the language of the statute is clear, there is no occasion to resort to a narrowing construction. *Boyle v. United States*, 129 S. Ct. 2237, 2246-47 (2009) (in RICO cases "we have rejected similar arguments in favor of the clear but expansive text of the statute"). Nothing in the language of the statute suggests that a person can own (and thereby seek to profit from) an illegal gambling business as long as he refrains from "active" participation. If that had been Congress' intent, there would have been no need to include the word "owns" in the statute. The terms "conducts", "manages", "supervises", and "directs" are sufficiently comprehensive to include all forms of active participation in the business. This Court should avoid a construction that would render the word "owns" redundant. *Exxon Corp. v. Hunt*, 475 U.S. 355, 369-70 (1986). By including "owns" and "finances" in the statute, Congress clearly intended to target all those who seek to profit from large scale illegal gambling enterprises – as well as those who deal the cards, serve the drinks, and take out the trash.

This is hardly a novel concept. It is well-established at common law that one cannot seek to profit from the wrongdoing of another. Thus, for example, a defendant cannot participate in or knowingly receive the benefits of another party's breach of fiduciary duty. *See Jackson Nat. Life*

24

*Ins. Co. v. Kennedy*, 741 A.2d 377, 392 (Del. Ch. 1999). That common law principle is one of general application, and it has been relied on in the enforcement of federal statutes. For example, in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), a copyright case, the Supreme Court explained that, "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement … and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it … . [T]hese doctrines of secondary liability emerged from common law principles and are well established in the law." 545 U.S. at 930 (citations omitted).

Defendants argue that the first five forms of conduct proscribed by § 1955(a) ("conducts, finances, manages, supervises, directs") involve active participation in gambling. Therefore, according to Defendants, the sixth activity ("owns") should be construed as requiring active involvement too. Defendants' construction suffers from several flaws.

First, "financing" and "owning" are both passive. Thus, two of the six types of proscribed participation in illegal gambling businesses require no active involvement. Congress expressly proscribed both active and passive participation.

Second, the canon of construction *ejusdem generis* is inapplicable. In *United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000), the Court explained that where "general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." 215 F.3d at 262. "Owns" is not a "general" word that "follows" a specific enumeration. To the contrary, "owns" is a "specific" word that is *part of* the enumeration.

Third, in *United States v. Hawes*, 529 F.2d 472, 478 (5th Cir. 1976), the Fifth Circuit rejected virtually the same argument made by Defendants here, saying, "[w]e are unable to agree

with this strained interpretation of an 'illegal gambling business.' Even upon a strict construction of the statutory language … we find no requirement that defendants must themselves engage in the act of illegal gambling."

Fourth, creating a judicial exception for passive ownership would eviscerate the statute because it would effectively exonerate the participants who are arguably most culpable: the owners who profit from the illegal activity.

Fifth, Nominal Defendant's ownership was not passive. Defendants caused Nominal Defendant to vote for management and its proposals at annual meetings. Surely the culpability of a multi-million dollar investor, who seeks to share in the illegal profits of the criminal enterprise, is greater than, for example, that of a waiter or janitor.

### 3. *There Is No Implied Exception for Ignorant Owners*

Defendants suggest that they cannot be guilty of violating § 1955(a) because they did not know it was illegal to own part of an illegal gambling businesses. Ignorance of the law, however, is no defense. *See United States v. Tedder*, 403 F.3d 836, 838 (7th Cir. 2005) ("[Defendant] told the jury that he thought [the Internet gambling businesses] were upstanding businesses operated in compliance with all laws. This was essentially the tax protester's defense that he just didn't think that the law, however clear, applied to his endeavors. ... The district judge gave appropriate instructions to the jury, which … convicted him.") (citation omitted). *See generally*, *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 565 (1971) (discussing "general rule that ignorance of the law is no excuse").

It is well-established that § 1955 is a crime of general criminal intent. *United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir. 1999), *citing Hawes*, 529 F.2d at 481. There is no requirement that the defendant be shown to have known that his conduct actually violated the

law. *Compare Cheek v. United States*, 498 U.S. 192, 199 (1990) (tax statute required "willful" violation, which requires knowledge of illegality).

Liability under § 1955(a) only requires knowledge of the facts – that the gambling businesses in which Defendants caused Nominal Defendant to invest were taking bets from gamblers in the United States or processing payments relating to such bets. The complaint alleges that Defendants had that knowledge.

Furthermore, while not required, the complaint also alleges facts that would support a finding of willfulness. Through their own professional due diligence investigations, and through numerous publicly-available sources of information, including news media, government sources, and information provided by the illegal gambling companies themselves, Defendants knew, or were reckless in not knowing, that the core of the gambling companies' business was premised on violating U.S. federal and state criminal statutes. (Compl. ¶¶ 56-64-70, 82-84) Indeed, it may reasonably be inferred that the primary attraction of these investments was the opportunity to share in the profits of that illegal activity.

Defendants argue that holding them liable for what they did would mean that the innocent investors who entrusted them with their savings might also be criminally liable. Contrary to Defendants' argument, mutual fund investors are in no danger of potential liability under § 1955. First, a shareholder of a corporation has no ownership interest in the assets of the corporation. *Smith v. Hurd*, 53 Mass. 371, 385 (1847). When Nominal Defendant purchased stock in the illegal gambling businesses, Nominal Defendant became the owner; its fund investors did not. Second professional mutual fund advisers typically perform due diligence research on the companies in which they invest and may therefore be charged with full knowledge of the business activities of those companies. In contrast, individuals who invest in mutual funds

27

typically do so precisely to avoid having to conduct such research. The periodic reporting that mutual fund investors receive typically only list the names of the companies in which the fund has invested, and an identification of the relevant industry, without any description of the business of the individual companies. Accordingly, even if mutual fund investors could somehow considered to be "owners" of the companies in which their funds invested – which they cannot – such investors could not be charged with specific knowledge of the illegal *activities* of the underlying gambling companies.

There is also no danger of "innocent" individual investors in the U.S. being rendered unwitting felons, because the shares of the illegal gambling businesses were not traded in the U.S. Therefore, any "individual" investors (if there are any) would not be "innocent," because they would have had to do what Defendants did: travel abroad for the purpose of bringing back contraband.

    4.    *There Is No Implied Exception for Publicly-Owned Illegal Gambling Businesses*

Nothing in § 1955 suggests a distinction between "illegal gambling businesses" that are closely held and those whose shares are publicly traded. The successful prosecutions of PartyGaming, NETeller, and other publicly-traded gambling companies confirm that there is no implied exception for public companies.

The *Bridges* court said that the legislative history "indicates that § 1955 was aimed at large scale gambling businesses." 493 F.2d at 921. *See* H.R. Rep. No. 91-1549, 91st Congr. 2d Sess., 2 U.S. Code Cong. & Admin. News at 4029 (1970). Public companies (which tend to be larger than private companies) are *more* likely, rather than less likely, to be within the scope of the legislative purpose of stamping out large scale illegal gambling operations.

28

5.      *There Is No Implied Exception for Foreign Illegal Gambling Businesses*

There is no basis in the language of the statute for an implied exception for foreign illegal gambling businesses. The successful prosecutions of many foreign gambling companies and their principals confirm that they are subject to the law. It would be a grave error for this Court to depart from the plain language of statute to create a judicial exception for ownership of companies that are formed in foreign jurisdictions for the purpose of violating U.S. law from a distance. Doing so would legitimize off-shore havens for illegal conduct.

Defendants say that no court has held that the purchase or ownership of publicly traded stock violates § 1955. Internet gambling is a relatively recent phenomenon, however, and the first illegal Internet gambling company to issue shares to the public was SportingBet plc in 2001. Such companies did not attract significant U.S. investor interest until some years later. Given this timing, it is hardly surprising that no court has yet had occasion to rule – one way or the other – on the legality of such investment. Because the issue is one of first impression, it is particularly important for this Court to set a precedent that makes clear that investors in the U.S. are not at liberty to financially aid and abet companies established in foreign countries for the primary purpose of preying on U.S. citizens, in the U.S., in violation of federal and state criminal law.

## IV.  DEFENDANTS VIOLATED RICO

A violation of § 1955 is a predicate crime under RICO. 18 U.S.C. § 1961(1)(B). By causing Nominal Defendant to violate § 1955 repeatedly and over a significant period of time, Defendants conducted the affairs of Nominal Defendant through a "pattern of racketeering activity" in violation of § 1962(c).

*McBrearty* does not stand for the proposition that the defendants in that case did not violate RICO by investing in illegal gambling. *McBrearty* merely held that, if there were a RICO

violation, it would not be actionable by the plaintiffs in that case because there was a lack of RICO "direct" injury between the plaintiffs' injury and the alleged RICO violations.

The complaint alleges all of the factual elements needed to establish a RICO violation: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Defendants manage the affairs of Nominal Defendant; the Nominal Defendant is an enterprise engaged in interstate commerce; and Defendants conducted the affairs of the Nominal Defendant through a pattern of violating § 1955. Defendants committed at least two predicate acts, 18 U.S.C. § 1961(5); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001), and the predicate acts were related, and they amounted to, or posed a threat of, continuing criminal activity. *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir.1997). There is no evidence that Defendants would have stopped investing in illegal gambling if prosecutions had not started. *See Ikuno v. Yip*, 912 F.2d 306, 308 (9th Cir. 1990); *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.1991) ("lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict").

## V. THE COMPLAINT ADEQUATELY ALLEGES PREDICATE VIOLATIONS OF STATE GAMBLING LAWS

The principal operations of the gambling businesses in which Defendants invested violated the laws of all fifty states (Complaint ¶ 27) Many of the successful prosecutions of Internet gambling companies and their executives under federal law, particularly under § 1955, were all necessarily predicated on violations of one or more state laws. To prevail on his claims, Plaintiff need not establish any violation of state gambling laws by Nominal Defendant or Defendants themselves. A violation of state law by the illegal gambling businesses is sufficient predicate for finding that Defendants violated § 1955 and RICO.

## VI.    STATE ANTI-GAMBLING LAWS ARE NOT UNCONSTITUTIONAL

In support of their argument that Plaintiff seeks to reach "purely foreign conduct." (Advisers Br. at 14) in violation of the "dormant" Commerce Clause, Defendants offer a hypothetical concerning Parisian and New York investors who purchase shares of 888 or NETeller in London. This hypothetical, however, muddles the distinction between the wrongful acts of *the gambling companies* and the wrongful acts of *Defendants*.

The actions of the Internet gambling companies in violating state gambling laws (the predicates for the federal violations at issue) are not purely foreign conduct because those actions take place in the U.S. as much as in Gibraltar or the Isle of Man (*i.e.,* the illegal bets were made in the U.S. by U.S. gamblers). Consistent with the Commerce Clause, States may prohibit such activities because, the burden of gambling regulation on interstate commerce is not "clearly excessive" in light of the legitimate state interests such regulation advances. *Rousso v. State*, 170 Wash. 2d 70, 91, 239 P.3d 1084, 1095 (2010) (*en banc*).

To the extent Defendants violated state gambling statutes by, for example, having "knowingly advance[d] or profit[ed] from unlawful gambling activity." in violation of N.Y. Penal Law § 225.05 their "profiting" or "advancing" took place at the principal place of business of Nominal Defendant in New York. New York can certainly prohibit those who do business here from profiting from or advancing illegal gambling activity here. This does not offend the Commerce Clause. *See Rousso.*

The actions of Defendants in violating § 1955(a) (owning illegal gambling businesses) and RICO (racketeering based on § 1955(a)) do not implicate the "dormant" Commerce Clause, because those are federal statutes.[7]

## VII.   PLAINTIFF HAS ADEQUATELY PLEADED HER COMMON LAW CLAIMS

### A.   Choice of Law

Defendants argue that this Court should apply Delaware law to each of Plaintiff's common law claims, but that is not so. Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993). If there is no conflict, "then the law of the forum state where the action is being tried should apply." *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 354 (1st Dept. 2004). Here, there are no material conflicts between the laws of Delaware and New York with respect to the elements of Plaintiff's common law claims. While Delaware corporate law clearly applies with respect to Plaintiff's waste claims (because the Nominal Defendant is a Delaware corporation), that is not necessarily true for Plaintiff's negligence and breach of fiduciary duty claims because Defendants are located and headquartered in New York. Without conceding that Delaware law

---

[7] Defendants argue that allowing the use of a federal statute to serve as the basis for negligence *per se* would "back door" a private right of action through state law. (Br. at 16 & n. 67) Defendants' argument is essentially than an invitation for this Court to abolish the entire doctrine of negligence *per se*. Defendants' suggestion would also overturn much of the law on fiduciary duties, because a fiduciary violates his duties of good faith when he causes a "corporation to violate the law" or to "use [ ] illegal means to pursue profit." *DeSimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007). Defendants' reliance on *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 189 (2d Cir. 2005), does not support such a sweeping abrogation of state common law. *Broder* concerned the use of New York's deceptive practices law to create a private cause of action to enforce a complicated regulatory regime (*i.e.,* uniform cable rates under 47 U.S.C. § 543). *Broder* does *not* stand for the proposition that an asset manager who violates the criminal law by investing in criminal organizations is somehow not negligent or has not breached his fiduciary duties.

applies to the negligence and breach of fiduciary duty claims, in this brief we demonstrate that the complaint is sufficient under Delaware law, because that is the law that Defendants invoke. The same result would obtain under applicable New York law.

      B.     **Plaintiff Has Adequately Pleaded a Claim for Negligence**

There is an overlap between Plaintiff's claims for negligence and his claims for breach of fiduciary duty. Accordingly, while they are separate and independent claims, we discuss their elements together.

The elements of a claim for negligence are (1) the existence of a duty of care; (2) a breach of that duty; and (3) proximately caused injury. *New Haverford P'ship v. Stroot*, 772 A.2d 792, 798 (Del. 2001). The elements of a claim for breach of fiduciary duty are "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd*, 11 A.3d 749 (2010).

      *1.     Defendants Had Duties of Care, Good Faith, and Loyalty*

Defendants do not dispute that, as officers, trustees, and investment advisers, they have duties of care, good faith, and loyalty to the Nominal Defendant.

      *2.     Defendants Breached Their Duties*

Violations of criminal statutes will support a claim of negligence *per se. New Haverford*, 772 A.2d at 798; *Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972).

Nominal Defendant is within the class of individuals intended to be protected by the statute that Defendants violated, which is a requirement for the application of negligence *per se*. Restatement (Third) of Torts § 12 (1999). Section 1955 and RICO were enacted together as part of the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922 (the "OCCA"). The statement of findings that prefaces the OCCA expressly refers to "harm to innocent investors"

and the corruption of "legitimate businesses" in connection with "syndicated gambling."[8]
Nominal Defendant (an otherwise legitimate business) was harmed because Defendants caused it
to become an investor in syndicated gambling. Therefore, Nominal Defendant is within the class
of individuals intended to be protected by the OCCA. There is no reason to suppose that
Congress was concerned exclusively with the protection of gamblers who patronize illegal
gambling businesses; its concern was expansive, as the statement of findings makes clear.

Even if Defendants did not commit a crime, a reasonable trier of fact could find that
when they caused Nominal Defendant to invest in a criminal enterprise, they failed to exercise
the degree of care that a reasonably prudent person would have exercised under the same
circumstances. Unregulated gambling is contrary to the laws and public policies of all fifty
states; it is wrongful for one party to knowingly seek to profit from the wrongdoing of another;
investing in criminal enterprises poses special risks not associated with lawful enterprises; and
therefore investing in such enterprises can reasonably be said to be imprudent.

Defendants also breached their duty of loyalty. As the court explained in *DeSimone v.
Barrows*, 924 A.2d 908 (Del. Ch. 2007):

> [B]y consciously causing the corporation to violate the law, a director would be
> disloyal to the corporation and could be forced to answer for the harm he
> has caused. Although directors have wide authority to take lawful action on behalf of
> the corporation, they have no authority knowingly to cause the corporation to

---

[8] The statement of findings states:

> Congress finds that … organized crime derives a major portion of its power
> through money obtained from such illegal endeavors as *syndicated gambling* …;
> [that] this money and power are increasingly used to infiltrate and *corrupt
> legitimate business* and … corrupt our democratic processes; [and that] organized
> crime activities in the United States weaken the stability of the Nation's economic
> system, *harm innocent investors* and competing organizations, interfere with free
> competition, seriously burden interstate and foreign commerce, threaten the
> domestic security, and undermine the general welfare of the Nation … .

84 Stat. 922-923 (emphasis added).

> become a rogue, exposing the corporation to penalties from criminal and civil
> regulators. Delaware corporate law has long been clear on this rather obvious
> notion, *i.e.*, that it is utterly inconsistent with one's duty of fidelity to the
> corporation to consciously cause the corporation to act unlawfully …. The knowing
> use of illegal means to pursue profit for the corporation is director misconduct.

924 A.2d at 934-35, *citing In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

*Accord Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch 2003) ("[O]ne cannot act loyally as

a corporate director by causing the corporation to violate the positive laws it is obliged to obey").

Defendants also violated their duty of good faith. As the court stated in *Walt Disney,* "[a]

failure to act in good faith may be shown ... where [a] fiduciary acts with intent to violate

applicable positive law." 906 A.2d at 67. Furthermore, "a fiduciary may not choose to manage an

entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in

profits for the entity." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techn., Inc*., 854

A.2d 121, 131 (Del. Ch. 2004).

Ignorance of the gambling laws is no excuse to criminal culpability for ordinary citizens.

*United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir. 1999). It certainly cannot be a defense to

civil liability for professional mutual fund managers who were on notice of the criminality but

chose to ignore the red flags being waived in their faces.

Defendants invoke the "business judgment rule," but that rule does not authorize the

violation of a statute or a comparable expression of public policy. *Miller v. Am. Tel. & Tel. Co.*,

507 F.2d 759, 762 (3d Cir. 1974) (when corporate decision "is itself alleged to have been an

illegal act, different rules apply" such that "the business judgment rule cannot insulate defendant

directors from liability"); S. Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93,

129 (1979) ("Bad faith may preclude application of the business judgment defense where

directors knowingly violate a statute or comparable expression of public policy, even if such a

violation is undertaken in the corporation's best interests"). Seeking to profit from an illegal

gambling business is not only criminal, it is also contrary to public policy. *In re Delaware Sports Service*, 196 A.2d 215 (Del. Super. 1963).

Depending on the circumstances, it might be a defense to liability if Defendants relied in good faith on advice of counsel, but that would be an affirmative defense that Defendants would have to plead and prove after an opportunity for discovery.

Defendants cite *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009), but in that case the plaintiffs were attempting to hold the director defendants liable for investing in the subprime market, which, in hindsight, turned out poorly for the company. There was no basis for a claim that the *Citigroup* directors acted other than in good faith. Investing in the subprime market may have been foolish, but it was neither criminal nor a violation of any public policy. This case, in contrast, does not involve a *legitimate* business risk. *In re Lear Corp. S'holder Litig.*, 967 A.2d 640 (Del. Ch. 2008), is distinguishable on the same basis.

Even if there was no actual violation of federal criminal law by the Defendants or Nominal Defendant, a jury could reasonably find that Defendants' investments in criminal enterprises was inconsistent with the standards required of reasonably prudent fiduciaries. Unregulated gambling is contrary to the criminal laws and public policies of all fifty states and the United States. Not only is it extremely risky to invest in them given the threat of criminal prosecution, but it violates a fundamental legal principle that it is wrongful for one person to knowingly seek to profit from the wrongdoing of another. A fact finder could reasonably conclude that the making of investments that depend for their success on the continuation of an illegal revenue stream is contrary to the standard of care, good faith, and loyalty required of reasonably prudent fiduciaries.

36

While the law has come a long way from the days when prudent fiduciaries were only allowed to invest in investments on the "legal list," we have not come so far that U.S. mutual fund managers are now at liberty to knowingly hazard the money of the beneficiaries they serve in enterprises established in foreign countries for the primary purpose of flouting federal criminal law and the criminal laws of all fifty states.

Defendants object that the complaint fails to allege that the investments were too risky in light of the Funds' other holdings. (Adviser Br. at 22) The risks associated with illegal gambling businesses can never be justified on a risk/reward basis because the investments were unlawful and contrary to public policy. No amount of upside potential would render them appropriate. As the United States Attorney for the Southern District of New York succinctly put it in connection with the prosecution of NETeller, "[s]upporting illegal gambling is not a business risk, it is a crime." (Compl. ¶ 117(c))

Defendants argue that they must be allowed to make a risky investments. (Adviser Br. at 21-23) This argument is legally flawed. "A fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." *Metro Communication Corp.*, 854 A.2d at 131. Investing in General Motors while hoping for company's financial resurgence involves a business risk. Investing in criminal activity is different. Selling cocaine is potentially lucrative; but despite the potential rewards, Defendants would still not be allowed to invest in a foreign drug cartel. The risk associated with that type of investment is that the enterprise value (*i.e.,* the market's belief of what its ongoing operations are worth) is dependent and based on an illegal revenue stream – which may abruptly disappear if the government successfully enforces the law against the cartel. This is precisely the type of improper risk that Defendants took.

Contrary to Defendants' argument, they are not insulated from liability for the damages caused by their illegal investments merely because the profits from their unrelated, lawful investments were sufficient to produce an overall profit for the portfolio. "[W]here the defendant's actions cause both a detriment and a benefit to the plaintiff, the value of the benefit offsets the detriment only when the benefits accruing to the plaintiff are sufficiently proximate to the wrong alleged and occur during the period of damage." *Trans World Airlines, Inc. v. Summa Corp.*, 1986 WL 5671 *413 (Del. Ch. 1986). The losses on illegal gambling were unrelated to any profitable investments Defendants may have made in lawful businesses. As the New York Court of Appeals has explained, the fact that a portfolio shows an overall increase in value "does not insulate the trustee from responsibility for imprudence with respect to individual investments for which it would otherwise be surcharged. … To hold to the contrary would in effect be to assure fiduciary immunity in an advancing market … ." *In re Bank of New York*, 35 N.Y.2d 512, 517 (1974).

The overall performance of a portfolio can and should be considered by a fiduciary in making *lawful and legitimate investments*, but that is because "to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity, as in the instance, for example, of individual security decisions based in part on considerations of diversification of the fund or of capital transactions to achieve sound tax planning for the fund as a whole." *Id.* Delaware's statutory provision that "[a]ny determination of liability for investment performance shall consider not only the performance of a particular investment, but also the performance of the portfolio as a whole," 12 Del. C. § 3302(c) is entirely consistent with the view that overall portfolio growth does not insulate fiduciaries from liability for imprudent, unlawful or illegitimate investments. This case does not involve trustees who lost

38

money in honest pursuit of portfolio diversification; it involves trustees who lost money seeking to share in proceeds of criminal activity.

### 3.     The Complaint Adequately Alleges Proximate Cause

Defendants do not dispute Plaintiff's allegations of proximate cause. This Court, however, may wish to consider that issue in light of the decision in *McBrearty* dismissing the RICO claims for lack of RICO causation. *McBrearty* held that the defendants' wrongful actions had not caused the plaintiffs' injuries for purposes of RICO because government enforcement of criminal laws had "intervened" between the defendants' wrongful acts and the plaintiffs' injuries. 2009 WL 875220 at *4. *McBrearty* is based on RICO causation, not common law proximate causation. In this Circuit, the two standards are different. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283-85 (2d Cir. 2006). And that difference produces a different result.

At common law, it is well established that the plaintiff need only prove that the defendant's wrongdoing was a substantial cause of the events which produced the injury. *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314 (1980). The defendant's wrongdoing does not have to be the sole cause of the injury because "there may be more than one proximate cause of an injury." *Jones v. Crawford*, 1 A.3d 299, 302, 304 (Del. 2010).

A defendant may be able to show that superseding events broke the chain of causation, but acts that temporally intervene between a defendant's wrongdoing that cause in part the plaintiff's damages may relieve the defendant of liability only when a jury finds the intervening acts to be abnormal, unforeseeable or extraordinary. *Id. at* 301. The doctrine of superseding cause has no application when the intervention of a third party or parties is reasonably foreseeable. *Id.* An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent. *Id.*; *Derdiarian*, 51 N.Y.2d at 316. Here, the risk of loss following

government enforcement was the foreseeable risk that Defendants created when they invested in illegal gambling. Furthermore, as *Jones* indicates, superseding cause is an affirmative defense that Defendants must plead and prove. *See Olson v. Motiva Enterprises, L.L.C.*, 2003 WL 21733137 *6 n.22 (Del. Super. 2003).

### C.    The Breach of Fiduciary Duty Claim Is Not Barred by Any Contract

Adviser Defendants argue that because the relationship between them and Nominal Defendant is governed by a contract, Nominal Defendant can only sue for breach of contract and not for breach of fiduciary duty. Their sole support for that argument is *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010). In that case, however, the court held that when "a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim." Since the defendants in that case had only done what the contract gave them the express right to do, the contract claim was dismissed. The breach of fiduciary duty claim was dismissed because the contract superseded and negated any distinct fiduciary duties arising out of the same conduct that constituted the contractual breach. Here, Defendants can cite nothing in the Management Agreement that expressly addresses the standard of care, loyalty, and good faith required of them; nor can they cite anything that supersedes or negates the fiduciary duties imposed on them by law.

Moreover, Trustees' duty to obey the law "cannot be contracted away … since it involves an important public interest." *Metro Commc'n*, 854 A.2d at 142. Consistent with public policy, the Management Agreement could not lawfully exculpate the conduct alleged here.

Finally, if there is any conflict between Delaware and New York law on this issue, New York law governs because this is not an issue of corporate governance, *see Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 301 (1st Dept. 2003). New York law permits Plaintiff to pursue overlapping contract and breach of fiduciary duty claims simultaneously. I*d.*

### D.     Plaintiff Has Stated a Claim for Waste

In *Michelson v. Duncan*, 407 A.2d 211 (Del. 1979), the Supreme Court of Delaware stated that "[t]he essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes." *Id*. at 217. While *Michelson* involved a transfer for no consideration, a lack of adequate consideration is not an essential element of a claim of waste. In *Agency Rent-A-Car, Inc. v. Gateway Indus., Inc.*, 1980 WL 3040 (Del. Ch. 1980), the court said there was evidence of waste where the president of a corporation had engaged in "the *improper* use of corporate credit cards for personal purchases [and] to *improper* expenditures of corporate monies for female companionship." *Id*. at *5 (emphasis added). The court did not suggest that liability would require proof that the corporate officer had overpaid – it was sufficient that he had acted "improperly." It is well-established at common law that it is improper for one person to seek to profit from the wrongdoing of another. For example, a defendant cannot knowingly receive the benefits of another party's breach of fiduciary duty. *See Jackson Nat. Life*, 741 A.2d at 392.

Defendants' reliance on *White v. Panic*, 783 A.2d 543 (Del. 2001), is misplaced. In that case, corporate assets were not used for an improper or *ultra vires* purpose. The court merely declined to "weigh the 'adequacy' of consideration" for an otherwise *lawful* corporate transaction. *Id.* at 554. For similar reasons, *Brehm v. Eisner,* 746 A.2d 244 (Del. 2000), is also inapposite.

Use of corporate proceeds to cause the corporation to violate federal and state criminal laws and public policy is illegal, improper, *per se ultra vires,* and outside the realm of business judgment. *See DeSimone*, 924 A.2d at 934-35 & n.89, *citing Walt Disney*, 906 A.2d at 67; *Miller*, 507 F.2d at 762.

## VIII.  IF THE COMPLAINT IS INSUFFICIENT, LEAVE TO AMEND SHOULD BE GRANTED

If the Complaint is in any way insufficient, Plaintiffs request that they be afforded an opportunity to amend to cure any deficiency pursuant to Fed. R. Civ. P. 14(a)(2).

### CONCLUSION

The motions to dismiss should be denied.

Dated: March 25, 2011

> /s/      Thomas I. Sheridan
> Thomas I. Sheridan, III
> Andrea Bierstein
> HANLY CONROY BIERSTEIN
> SHERIDAN FISHER & HAYES, LLP
> 112 Madison Avenue
> New York, NY 10016-7416
> (212) 784-6404
> tsheridan@hanlyconroy.com
> abierstein@hanlyconroy.com
>
> - and –
>
> Gregory P. Erthal
> SIMMONS BROWDER GIANARIS ANGELIDES
> & BARNERD LLC
> 707 Berkshire Boulevard
> East Alton, Illinois 62024
> (618) 259-2222
> gerthal@simmonsfirm.com
>
> *Attorneys for Plaintiff*